LEANNARDA *v.* LANSBURGH'S DEPARTMENT STORE

[No. 288, September Term, 1970.]

*Decided February 5, 1971.*

702

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*David B. Lamb* for appellant.

*William Clague*, with whom was *Francis C. O'Brien* on the brief, for appellee.

McWILLIAMS, J., delivered the opinion of the Court.

Spiked heels were stylish in the fall of 1968 and of course the appellant (Gwen) was wearing them when she and her daughter (Sallie) visited the store of the appellee (Lansburgh's) in the late afternoon of Saturday, 5 October. Five months later Gwen filed suit against Lansburgh's in the Circuit Court for Prince George's County alleging that she "tripped and fell" on a "rug in the dress department [which had] become frayed, tattered and torn." On 14 July 1970 the case came on for trial before DeBlasis, J., and a jury. He directed a verdict for Lansburgh's at the close of her case. She wants us to let her have another go at it but we think the trial judge hit the nail squarely on the head.

We shall, of course, consider the evidence, together with all proper and legitimate inferences to be drawn therefrom, in a light most favorable to Gwen, *Blanco v. J. C. Penney Co.*, 251 Md. 707, 708 (1968) ; *Rodriguez v. Lynch*, 246 Md. 623, 624 (1967), and we shall begin by letting her describe what happened:

> "Q. Tell us exactly what happened when you went to the dress department in that store?
> \* \* \*

"A. I was looking through the dresses in the dress department and we left to go to the coat department, and I had on high heeled shoes and the high heel got hung in the piece of rug. I grabbed my daughter. I did not go to the floor. My heel was hung in the rug. Mrs. Scholl [a Lansburgh's saleswoman] cut the piece of rug. * * * And she asked me if I was hurt and I said, 'No, but that is a dangerous spot there.'

* * *

"Cross Examination

"Q. Now, you were walking through and your heel caught on a thread in the rug and you had a sort of a stumbling affair but not a fall to the floor, is that correct?

"A. That is right.

"Q. And with that the people from Lansburgh's came over and made inquiry were you hurt, whether you wanted to make a report, and your answer was negative, that you were not hurt and you were not going to make a report on this particular day?

"A. She asked me if I was hurt and I said, 'No, but it is a dangerous spot.'

"Q. Did you notice anybody do anything about the spot while you were there?

"A. Mrs. Scholl did cut the piece of rug.

"Q. Cut the piece of rug. After she cut the piece of rug was there any other piece of rug there after she cut it?

"A. She cut that particular loop that my heel was hung in."

Sallie was the only witness (except a physician whose testimony was not transcribed) to testify for Gwen. She gave, in part, the following account:

"Q. Would you tell us in your own words what you saw happen?

"A. We were walking past the dresses and

she tripped over a rug and caught herself on me.

"Q. Did you see what she tripped over?

"A. Yes, a tear in the rug.

"Q. Did she fall to the ground or did something stop her?

"A. No she fell on me.

"Q. She fell on you?

"A. Yes.

"Q. You caught her?

"A. Yes."

On the following Monday Gwen, together with Sallie, returned to Lansburgh's. She took some color snapshots (at least five) of the carpeting where she said she stumbled and she cut several "loops" from the seam. We found none of the snapshots in the transcript but there is in the record extract one (identified as "Plaintiff's Exhibit No. 5") showing a seam in the carpeting with Sallie's toe pointing to what was said to be the spot where Gwen caught her heel. The snapshot can hardly be said to be informative. What is pointed out as the "dangerous spot" seems innocuous. We think it is clear, however, that the carpeting is not "frayed, tattered or torn." The "loops" taken from the carpeting by Gwen, although at best of doubtful evidential value, were not included in the transcript. Apparently she made no effort to obtain the "loop" cut from her heel by Mrs. Scholl. The record is silent in respect of how long the "dangerous condition" existed or whether Lansburgh's had either actual or constructive knowledge of it.

Ten days after she stumbled Gwen visited her family doctor with a complaint about her ankle which, she said, was swollen. He gave her some diuretic pills and told her he would take an X-ray picture if she wanted one. Ten days later she consulted a Dr. Casper. She said "he took an X-ray[,] * * * he bound the foot up and it was a chipped bone."

We shall not encumber this opinion with a repetition of the principles of law applicable to the facts of this

case; they will be found in *Mondawmin Corp. v. Kres,* 258 Md. 307 (1970); *Moulden v. Greenbelt Consumer Services, Inc.,* 239 Md. 229 (1965); *Lexington Market Authority v. Zappala,* 233 Md. 444 (1964); and *Rawls v. Hochschild, Kohn & Co.,* 207 Md. 113 (1955); but because what happened here is almost a carbon copy of what happened in *Selby v. S. Kann Sons Co.,* 73 F. 2d 853 (D.C. Cir. 1934), the following excerpts from the court's opinion are interesting and they reflect the views expressed in our own decisions:

> "And she testified: 'That Mrs. Childers (the clerk) showed her a pair of shoes which were not the kind which the witness wanted; that witness rose from the chair in which she had been sitting to go back to the shelves to show Mrs. Childers the kind of shoes which witness wanted; that something caught her heel and threw her forward, and when she got up and looked down she saw that there was a small rip in the binder rug facing her; that when she fell her knees struck a certain fitting stool; * * * that the carpet was not torn, but that the stitches fastening the binder to the end of the carpet had become ripped.'
>
> "She testified further, but to the same effect, and there was no evidence as to when or how the rip occurred; or to any knowledge of its existence by the defendant or its agents at any time prior to the accident; or of any opportunity to acquire knowledge.
>
> \* \* \*
>
> "In this case the plaintiff had been a customer in the defendant's store for thirty years; had previously bought shoes from the same saleswoman in the same room; and the alleged defective condition consisted of a small rip in the stitches between a rug and the binding on its end. The rug was not torn; the plaintiff saw no

rip before her fall; but when she got up after her fall and looked down she saw a small rip where the stitches had given way.

"Under this evidence the rip may have caused the fall, or the fall may have caused the rip by the plaintiff scraping her shoe along the rug, and there is nothing to indicate that the alleged defect had existed long enough to be detected by the most vigilant inspection.

"This state of the evidence leaves the case within the rule so often applied by the Supreme Court that where an accident may be due to any one of several causes, for some of which the defendant is legally responsible and for some of which he is not, there is such a fundamental failure of the plaintiff's proof that a verdict for the defendant should be directed." *Id.* at 853-54.

About all Gwen has shown us is that she caught her heel in a "loop" and stumbled. The "loop" might well have been the result of her spiked heel cutting into the seam, or it might have been done by one or more of the customers who preceded her. But if the condition in fact existed when Gwen came along there is nothing to show for how long it existed or that any of the Lansburgh's employees knew about it. To repeat what the court said in *Selby* "there is nothing to indicate that * * * [it] had existed long enough to be detected by the most vigilant inspection."

Gwen sees a kinship between her case and *Dickey v. Hochschild, Kohn & Co.*, 157 Md. 448 (1929), which she insists ought to weight the scales in her favor. We see it somewhat differently. In *Dickey* the plaintiff's heel became wedged between a metal tread and the wooden step supporting it. We held it was proper to submit the issue of negligence to the jury since the only permissible inferences were that the steps were defectively designed or constructed, or else there was a failure to inspect. There was evidence that the screws with which the tread was

fastened to the step were loose immediately after the accident. Since the plaintiff could not have created the defective condition it was possible to infer that it had existed for some time before her injury. Such an inference is unavailable here. As in *Selby* it is quite possible that Gwen's stumble created the alleged defect. We see a clear distinction between a metal tread which could have been loosened only by a screwdriver or a long period of sustained wear and tear, and a carpet seam none the worse for wear but vulnerable to the spiked heels of Gwen or an earlier customer.

*Judgment affirmed.*
*Costs to be paid by the appellant.*