## NIGIDO ET AL. *v.* FIRST NATIONAL BANK OF BALTIMORE

[No. 241, September Term, 1971.]

*Decided March 9, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, MCWILLIAMS, FINAN, SINGLEY, SMITH and DIGGES, JJ.

*Harry S. Shapiro,* with whom were *Shapiro, Peltz & Aversa* on the brief, for appellants.

*Alva P. Weaver, III,* with whom were *Lord, Whip, Coughlan & Green* on the brief, for appellee.

MCWILLIAMS, J., delivered the opinion of the Court.

In the Circuit Court for Baltimore County appellants alleged that on a day in March, 1968, Salvatore went to the appellee's branch at 25th Street and Kirk Avenue in Baltimore to make a deposit and to transact some "other bank business," that while he was there armed robbers entered and, in the course of accomplishing their nefarious purpose, they shot him "about his body and limbs," all "without any fault or stimulation" on his part. Appellants averred that the appellee (bank) was guilty of negligence because "its cameras and other protective devices were not functioning," because the bank's building was not "properly guarded," because the bank

"failed to take proper precautions to guard" its building, and because, "in view of the history of bank robberies" at that location, the robbery was "foreseeable." They alleged also that because the bank "was in a fiduciary capacity" with its customer it had a "special duty" to protect him "against harm caused by robberies, particularly in view of the fact that * * * [it] was aware of this history of robberies." Salvatore claimed $2,000,-000 in damages; together the appellants claimed $200,-000 for their loss of consortium. Following a hearing Judge Maguire, on 8 July 1971, sustained the bank's demurrer with leave to the appellants to amend within 30 days. For want of an amendment to their declaration a judgment for costs in favor of the bank was entered on 27 August. This appeal followed.

Appellants have not cited, nor have we found, any authority for the notion that the bank owed Salvatore "a special duty" to protect him against robbers. We think he was an invitee to whom was owed the same duty a shopkeeper owes his customer, i.e., to use reasonable care for his protection. *Noll v. Marian,* 347 Pa. 213, 32 A. 2d 18 (1943). For fuller and later expositions of the status of business invitees *see Bender v. Nalee, Inc.,* 261 Md. 82 (1971), *Leannarda v. Lansburgh's Department Store,* 260 Md. 701 (1971), and *Western Maryland Ry. Co. v. Griffis,* 253 Md. 643 (1969), and the' cases therein cited. We see in the declaration not an allegation that the bank's premises, per se, were unsafe for the purpose for which they were being used, but rather that the bank was negligent in failing to have its premises "properly guarded" against "foreseeable" robberies. The allegation that this robbery was "foreseeable" is supported only by the further allegation that there is a "history of bank robberies at the said location." But even if it could be said that the robbery was foreseeable it does not follow that the shooting of a customer was foreseeable.

While the averment that the "cameras * * * were not functioning" might be said to insinuate some sort of a

negligent act or omission, it might as readily be consistent with the exercise of reasonable care. In some banks the cameras contain film which is exposed only when an employee closes a hidden switch; in others the cameras take pictures automatically at regular intervals during banking hours. In larger establishments there may also be found television cameras which enable security officers to monitor activities in unsupervised areas. That the cameras "were not functioning" while the robbers were in the bank does not mean, necessarily, that they were inoperative because of some negligent act or omission. Indeed, in some banks, so we were told, there are cameras that are nothing but dummies, set up like scarecrows "to fear the birds of prey." [1] As we see it, however, the fact that cameras may not have been "functioning" can hardly have significance in the absence of a further allegation that the robbers *knew* that was the case. But even if the cameras had been running full tilt it is not likely the robbers would have been deterred even though the pictures taken might have led to their apprehension. The expression "other protective devices" seems to us to be simply a grace note.

The allegation that the bank's premises were not "properly guarded," and that the bank "failed to take proper precautions to guard" them are clearly conclusions of the pleader, utterly unsupported by an averment of facts. The very nature of the banking business requires the maintenance of an area to which the bank's customers can come to transact their business. It would be difficult, perhaps impossible, for guards to filter the robbers from the hundreds of daily visitors to the premises. After all, robbers usually are reluctant to disclose the purpose of their visit until after they have entered the premises; until then they look like customers. If the

1. "We must not make a scarecrow of the law,
   Setting it up to fear the birds of prey,
   And let it keep one shape, till custom make it
   Their perch, and not their terror."
Shakespeare, *Measure for Measure*, II, i, 1.

words "properly guarded" are intended to connote measures designed to bar the entry of robbers such measures could well turn out to be counter-productive, in that they might keep out most of the customers as well. It will be observed that appellants do not allege a total absence of guards or a complete lack of any precautions. It is the failure to "properly" guard, the failure to take "proper precautions" to guard upon which they rely. But, in appellants' declaration, "properly" is but an adverb and "proper" but an adjective and, as we have said many times, naked adjectival or adverbial words, phrases or expressions can never take the place of facts. This is not to say however, that alleging a total absence of guards would have saved the day. Indeed, it has occurred to us that not providing armed guards might very well reflect the exercise of sound judgment rather than negligence. If it is the rationale of the bank that armed guards might provoke gun-play and that it is better to lose cash than lives, then the total absence of guards would seem to be justified.

The allegation that there is a "history of bank robberies at the said location" seems to us to be adroitly contrived. The insinuation is that for some time the frequent visitation of this branch by robbers has been a way of life but the connotation of "location" is clearly imprecise and "history" might as appropriately refer to two robberies in a period of ten years as to one every month for the same period. Again we have only a conclusion of the pleader.

Appellants rely on cases dealing with injuries sustained in railroad depots, motion picture theatres, skating rinks, a ball park, and a school. *Garbis v. Apatoff,* 192 Md. 12 (1949) ; *Lillie v. Thompson, Trustee,* 332 U. S. 459 (1947) ; *Neering v. Illinois Cent. R. Co.,* 383 Ill. 366, 50 N.E.2d 497 (1943) ; *Crammer v. Willston Operating Co.,* 19 N. J. Super. 489, 88 A. 2d 630 (1952) ; *Williams v. Essex Amusement Corp.,* 133 N.J.L. 218, 43 A. 2d 828 (1945) ; *Exton v. Central R. Co. of New Jer-*

*sey,* 42 A. 486 (N. J. 1899) ; *McLeod v. Grant County School Dist. No. 128,* 42 Wash. 2d 316, 255 P. 2d 360 (1953) ; *Lee v. National League Baseball Club of Milwaukee, Inc.,* 4 Wis. 2d 168, 89 N.W.2d 811 (1958). None of them concerns a shooting, much less a shooting during the armed robbery of a bank, nor are they otherwise apposite. The bank cites in support of its position *Helms v. Harris,* 281 S.W.2d 770 (Tex. Civ. App. 1955), where a patron of a market was shot during a holdup; *Murray v. Osenton,* 126 So. 2d 603 (Fla. 1961), a suit brought by a service station attendant for injuries sustained during an armed robbery; *Genovay v. Fox,* 29 N.J. 436, 149 A. 2d 212 (1959), bowling alley patron shot during an armed robbery; *Schubowsky v. Hearn Food Store, Inc.,* 247 So. 2d 484 (Fla. App. 1971), customer of a grocery store injured by armed robbers; and *Brodie v. Miller,* 24 Tenn. App. 316, 143 S.W.2d 1042 (1940), customer of amusement hall shot by another customer who was drunk. Generally to the same effect are *Madden v. Clouser,* 262 Md. 144 (1971), and *Segerman v. Jones,* 256 Md. 109 (1969).

The bank relies also upon *Noll v. Marian, supra,* where a depositor, standing in line before a paying teller's window, was shot by an armed robber. Justice Drew, for the court, described the incident in these words:

> "* * * [W]hile he stood before the teller's window with his back toward the door from the street, he heard voices announce: 'It's a holdup. Nobody should move.' Plaintiff obeyed and stood perfectly still. Snyder, the teller, who was waiting upon him, after what seemed to plaintiff an interval of eight or ten seconds, grabbed something from the counter and instantly dropped out of sight. The bandits immediately fired three shots in Snyder's direction; two of them lodged in the furniture, and the third struck plaintiff in the hip, causing the injuries for which damages are sought. After a

verdict in favor of plaintiff, the learned court below set it aside and entered judgment notwithstanding in favor of defendants, and plaintiff appealed." 32 A. 2d at 18-19.

It was argued there that the failure of the teller to stand still when he knew or should have realized that action on his part might cause the robbers to shoot was a failure to observe that degree of care, precaution and vigilance demanded by the circumstances. In affirming the judgment below the court observed that in the dilemma presented to the teller he was not negligent in taking a course which in hindsight might have been the less prudent.

In *Altepeter v. Virgil State Bank*, 345 Ill. App. 585, 104 N.E.2d 334 (1952), Altepeter, a customer of the bank, was shot during an armed robbery. The appellate court affirmed the granting of the bank's motion challenging the sufficiency of Altepeter's elaborate complaint. The comment of Presiding Justice Dove, who delivered the court's opinion, is of interest:

"* * * It is not sufficient that the complaint allege a duty. The pleader must allege facts from which the law will raise a duty. The duty which the law raises from the facts alleged in these counts is that defendant must exercise ordinary care to safeguard the person of the plaintiff from injury while on its premises. No facts are alleged from which any one could conclude that defendant did not discharge this duty to the plaintiff. The allegation that defendant failed to take sufficient precaution to safeguard the plaintiff is a conclusion of the pleader, and charging that the defendant 'negligently and carelessly' and 'wilfully and wantonly' failed to take sufficient precautions to safeguard the plaintiff are simply conclusions of the pleader. Good pleading requires that facts must be alleged from which the law will raise a duty and

facts must then be alleged showing an omission of that duty and resulting injury." 104 N.E.2d at 337.

An interesting, if not entirely apposite, case grew out of an incident that took place just before the turn of the century on the *Alabama,* one of the great steamboats, now long gone, which sailed nightly on the Chesapeake Bay between Baltimore and Norfolk. In *Tall v. Baltimore Steam Packet Co.,* 90 Md. 248 (1899), Chief Judge McSherry, who delivered the opinion of the Court, described what happened as follows:

> "* * * After getting his supper he [appellant] went into the smoking-room of the steamer, where some twenty or more men-passengers were smoking and conversing. In the room there were several small tables and a number of chairs for the use of passengers. Shortly after the appellant went into the smoking-room Captain Bohannon, who was in command of the vessel, also entered, and remained there in conversation with some of the passengers until the occurrences now to be briefly narrated took place. At one of the tables in the smoking-room a passenger named Batten and another named Merritt were playing a game of cards for money, whilst others were looking on. A dispute arose between the two players and Batten applied to Merritt a vile epithet. The latter then arose and left the room. In a few minutes he returned, having his hand on his hip-pocket, and going up to Batten said something which was heard by only one witness. Instantly Batten struck Merritt a heavy blow, knocking him down, the captain sprung forward simultaneously and intervened, but Merritt drew a revolver from his pocket and fired; the bullet missed Batten and struck the appellant, who was standing some distance away. It lodged in his

elbow and severely wounded him. For the injury thus inflicted the appellant brought this suit against the steamboat company.

"The gravamen of the *narr.*—the sole ground upon which a right to recover is based—is the alleged negligence and want of care on the part of the defendant's servants and agents in failing to preserve order and to exercise proper control over its passengers." *Id.* at 250-51.

The concluding paragraph of Judge McSherry's opinion has some relevance here:

"The first and fourth grounds of error are one. They both involve the ruling which excluded from the jury proof of the rules or instructions prohibiting gambling on the boats. These rules or instructions were irrelevant. Had they been introduced they would not have thrown any light on the matter at issue. If the captain really violated any rule in permitting gambling on the steamer, that fact was no evidence of negligence which contributed to the injury, unless it can, either universally and invariably or, at least, with reasonable probability, be predicated of every act of gambling that it will end in such an act of violence. The argument is this: The shooting followed the blow that was struck; the blow followed the use of the abusive epithet; the epithet followed the quarrel, and the quarrel grew out of the game of cards; therefore the game of cards produced the shooting, and as the game of cards was prohibited by the company's rules the company's servants were negligent in allowing it to be played. But this is neither sound reasoning nor actual fact. Until you can predicate of a game of cards as its necessary result, an assault, you have nothing but speculation—you may have a sequence of events which are purely accidental in their relation

but are not inherently or necessarily the successive results of preceding causes." *Id.* at 258-59.

We find appellants' failure to amend somewhat perplexing. Counsel for the bank surely exposed the inadequacy of the declaration at the hearing on the demurrer before Judge Maguire. In fact we find in the transcript photocopies of the *Noll* and *Altepeter* opinions. It is rare that a plaintiff's counsel cannot find some way to patch up the flaws in his declaration which have been pointed out by demurring counsel, which leads us to suppose that, after pondering his dilemma, appellants' counsel concluded he could put his case no higher.

> *Judgment affirmed.*
> *Costs to be paid by appellants.*