HENRY R. FURR, Administrator of the Estate
of Kenneth A. Dawson et al. v. SPRING
GROVE STATE HOSPITAL et al.

[No. 646, September Term, 1982.]

*Decided January 7, 1983.*

The cause was argued before Lowe, Weant and Adkins, JJ.

*Walter J. Murphy Jr.*, with whom were *Welch, Murphy & Welch* on the brief, for appellants.

*Charles P. Goodnell, Jr.*, with whom were *Semmes, Bowen & Semmes* and *Richard M. Barnes* on the brief, for appellee Harris. *Larry M. Waranch*, with whom were *William B. Whiteford* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee Bartley. Submitted on brief by *Stephen H. Sachs, Attorney General, Randall M. Lutz* and *Judith K. Sykes, Assistant Attorneys General*, for appellee Spring Grove Hospital Center.

Lowe, J., delivered the opinion of the Court.

According to the Book of Genesis, God did not answer Cain's evasive question: "Am I my brother's keeper?". From that day to this man has individually sought to assume a moral responsibility to effect that purpose, but has consistently shied away from legally imposing such a

responsibility. In *Pope v. State,* 284 Md. 309, 324-325 (1979), the Court of Appeals pointed out that:

> "Under the present state of our law, a person has no legal obligation to care for or look after the welfare of a stranger, adult or child.
>
> 'Generally one has no legal duty to aid another person in peril, even when that aid can be rendered without danger or inconvenience to himself. . . . A moral duty to take affirmative action is not enough to impose a legal duty to do so.' W. LaFave & A. Scott, Criminal Law 183 (1972).
>
> *See* Clark & Marshall, A Treatise on the Law of Crimes § 10.02 (7th ed. 1967). The legal position is that 'the need of one and the opportunity of another to be of assistance are not alone sufficient to give rise to a legal duty to take positive action.' R. Perkins, Criminal Law 594-595 (2d ed. 1969). Ordinarily, a person may stand by with impunity and watch another being murdered, raped, robbed, assaulted or otherwise unlawfully harmed. 'He need not shout a warning to a blind man headed for a precipice or to an absent-minded one walking into a gunpowder room with a lighted candle in hand. He need not pull a neighbor's baby out of a pool of water or rescue an unconscious person stretched across the railroad tracks, though the baby is drowning, or the whistle of an approaching train is heard in the distance.' LaFave & Scott at 183. The General Assembly has enacted two 'Good Samaritan' statutes which afford protection to one who assists another in certain circumstances. Those statutes, however, impose no requirement that assistance be rendered."

In a limited number of ways, government has assumed restricted responsibilities for the care of specified classes of its citizens, but steadfastly refused to impose any sanction upon itself for failing to meet the standard it assumed,

continually clutching its shield of sovereign immunity. See *Macy v. Heverin,* 44 Md. App. 358 (1979). Recently, however, the Legislature lowered the State's shield a trifle by enacting the Maryland Tort Claims Act (Md. Cts. & Jud. Proc. Code Ann. § 5-401, *et seq.*), which permits limited recovery for State tort liability upon causes of action arising on or after July 1, 1982.

This cause of action, appealed from the Circuit Court for Baltimore County, arose from the State's acceptance of responsibility as keeper of its mentally handicapped but before the shield of immunity for failure to meet the proper standards of that role had been lowered. Among the facilities the State provided for those with mental difficulties is the Spring Grove Hospital Center [1] into which a person with a mental disorder susceptible of care and treatment may be admitted in one of three ways. See Md. Health-General Code Ann., Title 10, Subtitle 6: a voluntary admission (which is self-explanatory) pursuant to the appropriate procedure set forth in Part II of the Subtitle; [2] an involuntary admission requiring 2 physicians' certifications containing the requisites set forth in Part III; [3] or, in the event an individual is unusually dangerous to himself or others, he may be admitted under an emergency evaluation procedure set forth in Part IV. [4]

In September of 1975, a young male sex deviate in his early twenties named Arthur F. Goode, III, became a "voluntary" committee at Spring Grove for the second time in two years. Because of his pedophilic tendencies, Goode had been first admitted to Spring Grove on March 1, 1973, following an arrest for having committed violent and unnatural sex acts with little boys. He was diagnosed on November 1, 1973 and less than two years later was again arrested on similar charges. According to the hospital forensic unit director, Dr. Donald F. Bartley, Goode was initially returned to the hospital on April 30, 1975, and

1. Md. Health-General Code Ann., § 10-406, formerly Md. Ann. Code, Art. 59, § 31 (a).
2. Formerly Md. Ann. Code, Art. 59, § 11.
3. Formerly Md. Ann. Code, Art. 59, § 12.
4. Formerly Md. Ann. Code, Art. 59, § 22.

stayed through September 11, 1975, on a detainer for evaluation of his competency to stand trial pending court charges of assault and unnatural sex acts.

A hospital's note dated September 22, 1975 indicated Goode's expressed sexual preference for young boys around the ages of 10 to 12 and spelled out his admitted modus operandi and experience prior to his return to the institution for the evaluation. The extracts and appendices submitted to us indicate that certain evaluation and recommendations were communicated exclusively to Mr. Goode's attorney. The recommendations of Dr. Donald F. Bartley, who was the director of the forensic unit at Spring Grove, apparently were made upon numerous inquiries by that attorney, presumably contemplating a plea submission which ultimately was effected. Nothing in the record indicates that those evaluations and recommendations were sent to the court.

Goode, however, was given a suspended sentence conditioned upon his voluntary commitment to Spring Grove Hospital for treatment. The sentence was in accord with Dr. Bartley's recommendation addressed to Goode's attorney, and the condition was consummated by Goode's admission to the Hospital on September 11, 1975.

From the hospital's position a voluntary admittee is not restrained in the ordinary sense. If he wishes to leave, according to the Hospital's "Admission Procedures", he need only request release in writing, giving 72 hours notice and, unless he is a danger to himself or others, "he is released". If such voluntary admittee simply leaves without the requisite notice, he is considered to have "eloped" and presumably little or no effort is expended in effecting his return. "Patients who ... have eloped" however, "are accepted for return any time."

Arthur Goode's fourth stay at Spring Grove began September 11, 1975, during which time he appears to have occupied himself with unnatural sex acts upon other male patients, temporary "elopements" seeking out young males for sexual purposes when he was denied "outside privileges," and even threatening phone calls to his own sister.

Nonetheless, after a minimal confinement, he regained his "privileges" and even obtained an on-grounds paying job. After twenty weeks at Spring Grove on February 10, 1976, Goode again "eloped", this time to his parents' home in Florida. He notified the Hospital of his whereabouts and received mail from the hospital including his back pay. The hospital recorded that he was "[d]ischarged from elopement" and that it had "notified the Court of Arthur's elopement and discharge, and recommended to the Court that this patient be admitted to a criminal institution."

Exhibits of correspondence between Goode's attorney (Edward T. Conroy) and Goode indicated that Mr. Conroy's cajoling caused Mr. Goode to agree to return to Spring Grove. On the morning he was to appear, March 15, 1976, Dr. Olive Harris, who was the Director of Admissions at Spring Grove, had been forewarned that he was to return voluntarily. In addition to a detainer at the Hospital, she had been advised that the Florida police had requested notification of his return in order to ascertain his whereabouts for inquiry relating to the murder of a young boy in Florida.

When Goode arrived, in the company of his sisters, Dr. Harris was still busy with an admission of a patient needing restraint and asked Goode to wait. Goode — suspicious — followed her into her office and, when again told to return to the waiting room, decided to depart once more. On deposition he explained:

"A ... — when I walked up to the door, the office door, she was on the desk — at her desk on the phone. I didn't interrupt her. I just stood there for a minute — not a minute — wasn't even that long. She looked at me and put the phone down and, you know, held the phone over here (indicating) and gave me a nasty look. 'Well, go sit down,' or 'what you want now?' Something like that, you know.

I didn't just walk in there and start talking, get her upset, you know. But she was real upset, you know, like. And I haven't talked back to her or nothing. I was very polite to her.

Q So what did you do when she told you to go sit down?

A I just went on back and sat down with my sisters. And I told them, you know, 'Let's get out of here, you know,' because — I forget exactly what I told my sisters. They might remember.

But I just told them that, 'There's something strange going on around here, you know.' And I didn't know what the — I don't know what I exactly said.

But I knew that she was probably — that Dr. Harris — that she was probably on the phone calling the police, either Baltimore County police or the security guards around the hospital grounds or something, probably to hold me on this murder case here in Florida which I believe she may have gotten contacted about prior to my arriving there. In other words, it appeared —

Q Why did you think she had been contacted about it?

A Because it appeared to me that she was expecting me to come there. She was expecting me. That's the attitude she gave me.

So, like I said, I got up with my sisters and walked on out. In fact, I just walked on out. I didn't care if they're going to sit there or not.

. . .

Q How long had you been in the office?

A Well, they say ten minutes."

Goode never returned to the Hospital and within a week lured eleven-year-old Kenneth A. Dawson into a wooded area, committed brutal sex acts upon him, then murdered him. Kenneth's estate and his parents sued Spring Grove, Dr. Harris and Dr. Bartley for, among other things: negligent misdiagnosis and recommendations; negligently allowing Goode to abscond; and, negligently failing to

expedite his readmission and/or notify authorities of his reappearance and disappearance.

Spring Grove Hospital was dismissed on the basis of sovereign immunity, which relief was initially denied Dr. Harris; however, she and Dr. Bartley were subsequently the beneficiaries of summary judgments. The judge reasoned that Dr. Harris owed no duty to appellants' decedent and that Dr. Bartley's conduct was not the proximate cause of Kenneth's death; nor was the consequent death of Kenneth A. Dawson reasonably foreseeable.

Although appellants' question whether Spring Grove Hospital is immune from suit for negligence of its agents, servants, or employees, their one paragraph argument implicitly concedes the issue, contending only that the Court of Appeals should follow *Spencer v. General Hospital of District of Columbia,* 425 F.2d 479 (D.C.Cir. 1969),

> "and the multiple cases in other jurisdictions dealing with publicly operated hospitals should be the law of this State."

Since they further concede that we may not overturn the doctrine of sovereign immunity, *Macy v. Heverin,* 44 Md. App. 358 (1979), there is nothing for us to answer. While it is of little solace to appellants, we did note some legislative light emanating from a crack-in-the-door hereafter, through the enactment of the Maryland Tort Claims Act.

Our concern then, turns to the summary judgments entered on behalf of Doctors Harris and Bartley. That entered on behalf of Dr. Harris was entered because, absent any "special relationship," she owed no "duty" to the decedent. As to Dr. Bartley, the judge found that there was no proximate cause between the conduct of Dr. Bartley and the death of Kenneth A. Dawson, primarily it seems, because that consequence was not a reasonably foreseeable result of his conduct.

The concept of "duty" is, of course, the predicate upon which a negligence action is founded. There must be a duty or obligation which a defendant is under to protect the

plaintiff from injury and the negligence, as such, is the failure to discharge that duty resulting in a loss, injury or damage to the plaintiff. *Scott v. Watson,* 278 Md. 160, 165 (1976). The "duty" concept as used in negligence cases is really an obligation to conform to a standard of conduct toward an identified person. The specificity of the object of that obligation is of relatively recent origin since at old common law the obligation to behave properly was owed to all the world. It was not until the mid-nineteenth century that a plaintiff was required to bring himself within the scope of a defined legal obligation so that it may be regarded as personal to him. See generally, Prosser's *Law of Torts* (3rd ed.) Ch. 10, § 53 (1964). Like so much of our law, however, "duty" upon analysis has become more of a semantic conclusion than an analytical aid. In negligence law it is hopelessly intertwined with, and obscured by, the equally mercurial concepts of "proximate cause" and "foreseeability" — terms which are drawn upon, as the judge did here, to explain the result reached as best they are able.

In noting the narrowing of the object of one's duty from all the world at old common law, to a "foreseeable plaintiff," it would be judicial sacrilege not to acknowledge Judge Cardozo's opinion in *Palsgraf v. Long Island Railroad Co.,* 248 N.Y. 339 (1928). It was there that the courts began to view negligence as a matter of relation between the parties which must be founded upon the foreseeability of harm to the person who is in fact injured. Suit would thereafter stand only upon a wrong personal to the plaintiff and not as the vicarious beneficiary of duty to another.

Almost immediately the Restatement of Torts accepted the view that there is no duty and hence no negligence — or liability — to an unforeseeable plaintiff. Particularly apropos here § 315 of the Restatement (Second) (which the Court of Appeals essentially adopted as the law of Maryland in *Scott, supra* at 166) holds that as a general rule a private person is under no special duty to protect another from criminal acts by a third person, in the absence of a statute, or special relationship. That point was also emphatically made in *Pope, supra.* The Court there was faced with a

criminal defendant whose moral crime was to watch a guest in her own home physically abuse the guest's own child, ultimately killing it in a most hideous manner.

> " 'Calling out that Satan had hidden in the body of her son, Melissa began to verbally exorcise that spirit and physically abuse the child by punching and poking him repeatedly about the stomach, chest and privates. After she undressed the child, that which ensued was hardly describable. In her religious frenzy of apparent exorcism, Melissa poked the child's vitals and beat the child about the head. She reached her fingers down its throat, wiping mucus and blood on diapers at hand, and even lifted the child by inserting her hands in its mouth, and shook him like a rag.' " *Id.* at 315, quoting *Pope v. State,* 38 Md. App. 520, 531 (1979).

It was in that context that the Court held that there was no legal duty to aid another, even in known and obvious peril. While *Pope* was in a criminal context, *Scott* carried over the absence of a duty concept to civil negligence law as well, and the two cases clearly lay to rest appellants' appeal to this Court to "impose a duty on a person who simply sits on their [sic] hands and lets the foreseeable horror happen." Whatever our inclination in that regard, the prerogative may be one of the Court of Appeals, but it is not a right within the aegis of this Court. *Hans v. Franklin Square Hosp.,* 29 Md. App. 329, 315-336 (1975), *cert. den.,* 276 Md. 744 (1976).

We should pause in this evidentiary review of the duty aspect of negligence law to determine, if we can, just what obligation appellants would impose on the two doctors, by what standard they would have us measure it, and to whom they would have it run. While the standards they assert are evasive, we will assume such suffice in order better to focus upon the doctors' obligations and their relationship to the decedent.

The only evidence presented to us by appellants' extract indicating the purpose for which Dr. Bartley was called upon

by the court to evaluate and diagnose Arthur Goode, was to determine for the court Goode's competence to stand trial. Appellants did not present us with any evidence of the court order asking for an evaluation, nor did they provide the forensic staff evaluation. Presumably their allegation of negligent misdiagnosis and recommendations directed at Dr. Bartley was in reference to the letter to Goode's attorney which the record discloses that the attorney used to convince Arthur's parents to acquiesce to a conditional plea disposition of their son's case since he had been found mentally competent to stand trial. In that regard, Mr. Conroy's letter to Arthur Goode's parents is self-explanatory.

"As you know, it has been a long period of time that your son has been at Spring Grove, apparently with no decision being made as to his future. Please be advised that I have been consistently working on the case with Dr. Bartley in order to do what is best for my client with, of course, consideration for society at large.

In a report recently received by Dr. Bartley from Spring Grove, the doctor was quoted as follows:

[']Mr. Goode is at present housed in our Forensic Division. This division is staffed primarily for forensic evaluation and not long term treatment. It would be appropriate for Mr. Goode to be transferred to his regional treatment area here in the hospital, Unit III, the White building. Here he would receive the services of social worker, psychologist, and psychiatrist — all formulating and implementing a treatment plan designed for his own special needs. Such a plan would also include gradual resocialization and rehabilitation. In this setting his behavior would be monitored and his progress observed and evaluated. In my opinion a punitive course of action with incarceration would not be advisable.[']

With this aforementioned report, I was able to convince the State's Attorney to agree to a

sentencing of your son scheduled for September 11, 1975, at 10:30 a.m. in Upper Marlboro, Maryland. I would welcome and appreciate your attendance on that date. Based on our meeting with the State's Attorney, if the Judge agrees, the State has recommended that under the single perverted sex act charge (case no. 30544) that your son be sentenced to 5 years and under the assault and battery charge to which there was also a guilty plea (case no. 1600), a sentence of 3 years in prison. The recommendation will be that the sentences run concurrent which means both times will be running at the same period of time. The recommendation also will be, if the judge adopts the same, that the sentence be suspended providing certain conditions are met. The major condition that must be met is that your son be transferred to the 'White' building at Spring Grove and that he enter into the course of rehabilitation as described by Dr. Bartley. A further condition will be that if and when Arthur becomes rehabilitated that Dr. Bartley or his representative render a report to the court stating the same at which time Arthur would have to return to court with the court agreeing to his release if that was recommended.

I think that, under the circumstances, this is an excellent, reasonable and healthy disposition of the matter if we can convince the court to endorse the same. You must understand also that Blue Cross and Blue Shield must agree to pay the substantial portion of the hospitalization and treatment costs as we discussed earlier.

Whether this State psychiatrist's cooperation with the attorney [5] of a defendant-patient sent by the State to a State

---

5. The attorney was also a State Senator which may explain the cooperation of Dr. Bartley who testified that he was aware that the attorney's numerous phone calls and requests were initiated for purposes of obtaining advice and help for purposes of disposition.

Hospital for other purposes, is proper, is not an issue here. Assuming this extracurricular cooperation was improper (which we certainly do not decide) and that it was negligently provided for the attorney, we fail to see how it creates a "duty" running to the decedent. We will also assume for purposes of this consideration that Dr. Harris' admissions office responsibilities to the Hospital had been negligently performed. Even with such assumptions — which have little, if any, factual support in the extract — we fail to see how it constituted a duty breach running to appellants or the deceased child they represent.

Essentially, as to Dr. Harris, appellants contend that on the basis of a message that Arthur Goode was suspected of a criminal act in Florida, and on the basis of an alleged duty to review his previous hospital records prior to his arrival at Spring Grove, she was required to take some action on her own to detain, arrest, or notify the local authorities to hold Goode against his will on March 15, 1976. As to Dr. Bartley, appellants charge that the doctor negligently diagnosed Goode and negligently recommended that he be treated at Spring Grove rather than a maximum security institution.

The general absolution of an individual from the "moral obligation of common decency and common humanity, to come to the aid of another human being who is in danger" *Prosser,* at 340, seems clearly established in Maryland, *Scott, supra,* and would, of itself, satisfactorily support the trial judge's decision to grant summary judgment. See also Anno., 10 A.L.R.3d 619, 623. That the appellees, (especially Dr. Bartley) assumed responsibility to everyone in the world at large, when he went beyond the requested determination of Goode's competency to stand trial as asked by the court, and voluntarily extended his expertise to aid appellants' counsel in receiving an unconfined treatment as the result of a plea agreement, is without support in Maryland law.[6]

---

[6]. Appellants rely heavily upon Cutlip v. Lucky Stores, 22 Md. App. 673 (1974), for their "broadcast-theory" of a right to demand enforcement of a duty; however, in the Cutlip case we specifically held that a workman in a defective building under an architect's supervision was within a class to whom a duty flowed. We expressly withheld any decision as to whether the duty flowed to the public. *Id.* at 694.

If there is no duty to come to the assistance of a person in difficulty or peril, however, there is at least a duty to avoid affirmative acts making his situation worse. And presumably when Dr. Bartley recommended the loosely structured treatment of a potentially dangerous patient, the resultant death of Kenneth A. Dawson was according to appellants, the "proximate, foreseeable" result. Appellants would have us apply a "but for" doctrine to raise the pre-*Palsgraf* common law right to sue because of a foreseeable consequence to someone in the world at large rather than restrict the right to a foreseeable plaintiff. They point to such cases as *Shaw v. Glickman,* 45 Md. App. 718 (1980), and a case we discussed there, *Tarasoff v. Regents of the University of California,* 17 Cal. 3rd 425 (1976), in which we pointed to, but declined to accept or reject, a duty upon private psychiatrists to warn specifically identifiable victims. They argue seemingly, from those cases, that

> ". . . it is not the relationship of physician and patient which gives rise to the duty to prevent foreseeable harm, *i.e.,* warn identifiable potential victims; it is rather the ability to protect the victim which has caused the courts to impose the liability. The duty of private psychiatrists may in general be limited to warning identifiable victims, because those are the only ones they have the ability to protect, because of lack of a general authority to restrain, but the limitation, of course, does not apply, as pointed out above, to persons situated such as Dr. Harris. The concept that the duty arises not from the relationship to the antisocial actor because of having undertaken to control him but rather from the ability to avert a foreseeable harm to the public at large or an identifiable class thereof has been recognized in many cases."

That is simply not the law, even if we accepted the *Tarasoff* duty of a psychiatrist to warn a potential victim. *Tarasoff* itself imposed the duty only when the doctor knows the identity of the victim who has been threatened. In a more

recent case with factual apposition both here and to *Tarasoff*, the California Supreme Court more carefully identified the limitation it suggested in *Tarasoff*. In *Thompson v. County of Alameda*, 167 Cal. Rptr. 70, 76 (1980), the Court stated:

> "We noted in *Tarasoff* that a special relation existed between the defendant therapists and the patient which may support affirmative duties for the benefit of third persons [citation omitted]. The *Tarasoff* decedent was the known and specifically foreseeable and identifiable victim of the patient's threats."

The Court went on to explicate its limitations by saying:

> "Thus we made clear that the therapist had no general duty to warn of each threat. Only if he 'does in fact determine, or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others [does he bear] a duty to exercise reasonable care to protect the *foreseeable victim* of that danger.... Although the intended victim as a precondition to liability need not be specifically named, he must be 'readily identifiable'."

This clarification coalesces with § 315 of the Restatement of Torts, 2nd which states:

> "There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection."

It is apparent that *Tarasoff* and *Thompson* are both saying what the Restatement section adopted in *Scott, supra,* is saying, *i.e.,* for a doctor's *Tarasoff* duty to be imposed creating a special relationship to a victim, the victim must be readily identifiable.

There is a further irreconcilability within appellants' argument and that arises from the inconsistency between the negligence they allege and the *Tarasoff* duty they rely upon. The negligence they charge of misdiagnosis and failure to readmit Goode does not relate to any known dangerous propensity of Goode. Assuming that appellees should have known of his dangerous propensities and restrained Goode, whom should they have warned that they had failed to do so?

But even to reach that illogical inquiry, we must gloss over the fact that neither Dr. Bartley nor Dr. Harris had any right to restrain Arthur Goode, beyond the court ordered diagnosis and the subsequent voluntary admission from which Goode had eloped. No one at the Hospital had any right to compel Goode to stay since the condition to commit himself was a responsibility imposed upon him, not upon the Hospital.

That society has not yet acquired the clairvoyance to determine and restrain those bent upon preying on such youths as Kenneth Dawson is a phenomenon we can only hope to overcome. But when such violence is perpetrated it is not always the fault of those charged with seeking out such sinners. As pointed out by Prosser, frequently under our law it is the good samaritan who tries to help somewhat and finds himself mulcted in damages, while the pervert and the deviate who pass on the side go on their cheerful way rejoicing. As we impose upon samaritans (and those who walk in their shadow) more obligations in the nature of *Tarasoff's,* we must avoid driving them to the other side of the road.

> *Judgment affirmed.*
> *Costs to be paid by appellant.*
> *Cross-appeal dismissed, costs to be*
>   *paid by cross-appellants.*