809 A.2d 10

Rebecca M. MOORE

v.

JIMEL, INC., t/a Hightopps Bar and Grill.

No. 1985, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 27, 2002.

Michael B. Green, Towson, for appellant.

Kathleen M. McDonald (Kerr McDonald, LLP on brief), Baltimore, for appellee.

Argued before SONNER, ADKINS, CHARLES E. MOYLAN, JR., (retired, specially assigned), JJ.

MOYLAN, Judge.

The appellant, Rebecca M. Moore, was, on October 4, 1998, a customer in the commercial establishment owned by the appellant, Jimel, Inc., t/a Hightopps Bar and Grill in the Fells Point neighborhood of Baltimore City. While using the ladies' restroom on the third floor at approximately 6 p.m., she was attacked and raped. She sued the appellee in the Circuit Court for Baltimore City for negligently having failed to provide the security owed to her as a business invitee.

The appellee moved for summary judgment in its favor. Judge John Carroll Byrnes granted the summary judgment motion, ruling that the appellant failed to establish a duty to protect a patron against crimes committed by third persons.

In *Valentine v. On Target,* 353 Md. 544, 549, 727 A.2d 947 (1999), Judge Karwacki listed for the Court of Appeals the required elements of the tort in question.

> To maintain an action in negligence, the plaintiff must assert in the complaint the following elements: "(1) that the defendant was under a duty to protect the plaintiff from

injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty."

It is the first of those elements that concerns us here. This case turns on whether the Hightopps Bar and Grill, under the undisputed circumstances of this case, owed a duty to its customers to provide enhanced security to guard against criminal attacks on the customers by third persons.

### The Existence of a Duty Is a Question of Law

A key procedural question is that of whether the existence of such a duty is a question of fact, for a jury, or a question of law, capable of being decided by the judge on summary judgment. It is the teaching of *Valentine*, 353 Md. at 549, 727 A.2d 947, that that question is one for the court, as a matter of law.

> Generally, whether there is adequate proof of the required elements needed to succeed in a negligence action is a question of fact to be determined by the fact finder; but, *the existence of a legal duty is a question of law to be decided by the court.*

(Emphasis supplied).

In the *Valentine* case itself, the Court of Appeals affirmed the dismissal of a suit because the complaint, as a matter of law, failed to allege a legally cognizable duty owed by the defendant to the plaintiff. The Court cited a number of cases in which there had been held to be the lack of a duty and in which such a determination was one properly to be decided by the trial judge, as a matter of law.

> As clearly outlined by Judge Wilner, "[t]he view expressed in *Scott* has been confirmed in later cases. *See Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985); *cf. Southland Corp. v. Griffith*, 332 Md. 704, 716–17, 633 A.2d 84 (1993), applying the same principle with respect to a duty to aid, *i.e.*, there is no duty on the part of a storeowner to aid a customer from attack by a third person in the absence

of statute or special relationship. *See also Ashburn v. Anne Arundel County,* 306 Md. 617, 510 A.2d 1078 (1986) (police officer had no duty to prevent allegedly drunk driver from injuring pedestrian); *Furr v. Spring Grove State Hosp.,* 53 Md.App. 474, 454 A.2d 414, *cert. denied,* 296 Md. 60 (1983) (psychiatrist owed no public duty to prevent harm by failing to detain patient); *Hartford Ins. Co. v. Manor Inn,* 335 Md. 135, 642 A.2d 219 (1994)." *Valentine v. On Target,* 112 Md.App. 679, 686, 686 A.2d 636, 639 (1996).

353 Md. at 552, 727 A.2d 947.

In *Nails v. Community Realty Co.,* 166 F.3d 333, 1998 U.S.App. LEXIS 31576 (4th Cir.1998),[1] the United States Court of Appeals for the Fourth Circuit applied Maryland law as it held:

> Under Maryland law *whether a landlord has a duty to protect tenants is a legal question,* ... which we review de novo.

(Emphasis supplied).

### The Factual Background

Sunday, October 4, 1998, was the final day of the Fells Point Festival, an occasion on which the neighborhood and its commercial establishments would be expected to be more than ordinarily crowded. The Hightopps Bar and Grill is at the corner of Broadway and Thames Street, the literal epicenter of Fells Point. Hightopps is a three-story establishment. The first floor is a bar, with several tables for customers. It is entered from Thames Street. The second floor contains both a game area and a restaurant. The third floor has an outdoor deck overlooking both Thames Street and Broadway. It also has a bar, two restrooms, a storage area, and an office.

There are two approaches to the second and third floors. They may be reached through a ground level door on Broad-

---

1. *Nails v. Community Realty Co.* is an unpublished opinion of the Fourth Circuit listed at 166 F.3d 333. The text of the opinion is nonetheless circulated by both West Law and LEXIS.

way, which leads to a stairway with entrances to both the second and third floors. Those upper levels may also be approached from an interior stairway leading from the first floor bar area. There are thus two doors providing ingress for the public, one on Thames Street and one on Broadway.

Because of the anticipated crowd from the Fells Point Festival (the weather turned out to be cold and damp and the crowd was less than anticipated), Hightopps had approximately six security personnel on duty on the evening of October 4. A separate guard was stationed at each of the public entrances, the door on Thames Street and the door on Broadway. Their primary mission was to prevent 1) underage persons and 2) obviously intoxicated persons from entering the establishment. A third guard was stationed at the top of the stairs leading up from the door on Broadway, at the entrance to the third-floor deck. The other three security personnel walked throughout the premises to prevent disruptive incidents between patrons and to handle them if any such incidents should occur.

The appellant, as part of a party of six persons, arrived at the Fells Point Festival at approximately five p.m. In her party was her fiancé, Jason Postlewaite; her friend, Lauren Wolf; another work-acquaintance named Jen; and two friends of Jason's, Ryan Currie and Ryan Dunnigan. Shortly after their arrival at the Festival, the party entered Hightopps via the door on Broadway and climbed the stairs directly to the third-floor deck.

The appellant recalled that someone at the Broadway entrance was "carding," to wit, checking the identification cards for age, of everyone who entered. She also recalled a bartender being present behind the third-floor deck bar. When the appellant and Lauren returned from an uneventful trip to the restroom shortly after their arrival at Hightopps, the appellant recalled there being between six and ten customers, in addition to her own party, on the third-floor deck.

The appellant described her first and uneventful trip to the restroom. From the deck she ascended five to seven steps to

a hallway. The door to the ladies' room was "another twelve strides" from the top of those stairs. That third-floor ladies' room had two stalls, each with a swinging door. The large stall on the left (as one enters the ladies' room) had a sliding-type latch; the other stall had no latch. The door from the hallway had no lock because the restroom was designed to be used by more than one person at a time.

On that first trip, the appellant simply "primped" at the mirror while Lauren used one of the stalls. In terms of noise level, the appellant and Lauren were able to converse with each other in normal tones. Lauren made no comment about a door not closing or a latch not working. The appellant saw nothing that caused her to be concerned for her safety. She described the facility as a "fairly typical bar bathroom." Although the appellant's brief now characterizes the lighting as "dim," her deposition testimony was that the lighting did not appear to her to be particularly dim, either in the rest-room or in the hallway leading to the restroom. It was, moreover, not yet dark outside.

At about six p.m., the appellant made her second trip to the restroom, on that occasion alone. At that time, in addition to her own party there were "between two and six other people" on the deck. With respect to the demeanor of the crowd, moreover, the appellant, in her deposition, described it as being qualitatively quiet as well as quantitatively sparse.

Q. Was there anything about the other patrons that you saw at Hightopps at any time before this incident that caused you to be concerned about your safety or your security?

A. No.

Q. They weren't rowdy or poorly dressed?

A. No, *it was just rather quiet. Most of what I remember being up there were kind of petite little females,* because I think that's kind of why my party was interested in staying up there.

Q. You mean the men in your party?

A. Yes.

(Emphasis supplied).

There was no suggestion as to why there should have been a heightened need for security because of an unusually large or unruly crowd. Indeed, where a rape occurs in an allegedly lonely restroom off an allegedly secluded hallway, the danger would seem to stem more from the lack of people than from the presence of too many people.

When the appellant arrived there, no one else was in the restroom. The appellant chose the stall on the right, without the latch, rather than the stall on the left, with the latch. It did not concern her that she had to hold the stall door shut, because she had been in public restrooms before where that had been the case.

The appellant then saw a man enter the restroom, a man she knew, from past acquaintanceship, to be one Richard Casey.[2] In her deposition, the appellant stated that she "looked" and "kind of opened her stall door to see if it was Lauren." The lack of a latch does not appear to have had significance.

There was then nothing in Casey's appearance or initial behavior to cause the appellant any concern. He looked "like a normal guy" and she did not smell alcohol on his breath at any time. The fact that Hightopps served intoxicating beverages does not appear to have had any significance.

At that point, Richard Casey entered the stall, grabbed the appellant by the shoulders, turned her around, and raped her from behind. The appellant in her deposition described the nature of her yells or screams:

Q: How many times did you scream?

A: Twice.

---

2. Richard Casey was arrested and tried for the assault on the appellant. At his trial in the Circuit Court for Baltimore City on March 3, 2000, however, he was acquitted.

Q: Was one scream louder than the other, that you were conscious of?

A: The second one was louder.

Q: Did you yell words or did you just scream a sound?

A: No, I think the first time, I think the first time I yelled "help" or something stupid. And then the second time I yelled "please, stop," thinking, I think in my head at the time, thinking maybe somebody had heard "help," but was thinking it was somebody playing around or joking.

Casey asked the appellant if she wanted him to kill her, and she quieted down. As she was being sexually assaulted, however, the appellant kicked backward, striking Casey. He backed out of the stall, backed out of the restroom, and disappeared. The appellant remained in the restroom for two or three minutes and then returned to the deck, where she informed her fiancé that she had been raped.

The only other exhibit before Judge Byrnes, as he made his ruling on summary judgment, was the affidavit of one of the owners of Hightopps, attesting, *inter alia,* to the fact that,

[a]t no time prior to this alleged October 4, 1998, incident were there any incidents of physical or sexual assault against a female patron in the Hightopps premises, much less in any of the bathrooms, nor had there been any crimes against persons committed in this facility, other than minor altercations between patrons.

## No General Duty to Protect Patrons From Crimes by Third Persons

■ We hold that Judge Byrnes was not in error in granting summary judgment in favor of the appellee on the ground that Hightopps owed no duty to its customers to protect them from the criminal acts of third persons while on the premises of the bar and grill. We find to be absolutely dispositive the opinion of Chief Judge Murphy for the Court of Appeals in *Scott v. Watson,* 278 Md. 160, 359 A.2d 548 (1976).

In *Scott v. Watson,* the plaintiff had "claimed that the defendants had breached a duty owed to Scott as one of their

tenants to protect him from criminal acts of third parties committed in common areas within their control." 278 Md. at 161, 359 A.2d 548. Following a transfer of the case to federal court, the United States District Court certified to the Court of Appeals three questions of law, the first two of which are pertinent to the case before us.

"(1) Does Maryland law impose upon the landlord of an urban apartment complex a duty to tenants to protect them from the criminal acts of third parties committed in common areas within the landlord's control and, if so, what is the extent of such duty?

"(2) If no such duty exists generally, would such a duty be imposed if the landlord has knowledge of increasing criminal activity on the premises or in the immediate neighborhood?"

278 Md. at 161–62, 359 A.2d 548.

Although the first question was posed in the context of a landlord's duty to a tenant, the answer would also apply with respect to a merchant's duty to a patron. In *Nigido v. First National Bank*, 264 Md. 702, 288 A.2d 127 (1972), a bank customer, wounded in the course of a bank robbery, sued the bank for negligently failing to provide adequate security. In affirming the dismissal of the suit, as a matter of law, the Court of Appeals expressly analogized the absence of a special duty in that case to the absence of such a special duty by a shopkeeper to his customer.

Appellants have not cited, nor have we found, any authority for the notion that the bank owed Salvatore "a special duty" to protect him against robbers. *We think he was an invitee to whom was owed the same duty a shopkeeper owes his customer, i.e.,* to use reasonable care for his protection.

264 Md. at 704, 288 A.2d 127 (emphasis supplied).

In *Tucker v. KFC National Management Co.*, 689 F.Supp. 560 (D.Md.1988), a customer sued Kentucky Fried Chicken, alleging that "it did not provide an adequately safe place for its business invitees" and that it negligently "had failed to have a security guard on the premises." 689 F.Supp. at 561.

In granting summary judgment in favor of KFC, Judge Niemeyer made it clear that "the applicable law is that of Maryland." 689 F.Supp. at 562. He cited as authoritative both *Scott v. Watson* and *Nigido v. First National Bank,* as he held:

> The duty to protect patrons against conduct of third persons does not exceed the general duty of care and duty to warn of hidden dangers. A higher duty to protect a private person from the conduct of a third person arises under Maryland law only when a special relationship exists, such as that created by common carrier and passenger. *The storekeeper and business invitee do not have that special relationship.*
>
> . . . .
>
> *The general duty of reasonable care . . . does not include a requirement to provide police protection.*

*Id.* (emphasis supplied).

Judge Niemeyer's conclusion made it clear that the question of whether a duty is owed is an issue of law, for the court, and not an issue of fact, for the jury.

> Were the Court to hold otherwise, every newsstand, drug store, fast food establishment, gas station and similar establishment would be required to provide security guard service for its business invitees. The articulation of a duty so broad and with such extensive consequences rests on the legislature and will not be imposed judicially. Would one guard be enough? What procedures would be necessary for the guard to prevent criminal activity? Could the requirement to have a security force or guard not lead to greater harm and exposure to business invitees by confrontation? *These are not questions of reasonableness for the jury to decide, but are questions of duty.*

689 F.Supp. at 563–64 (emphasis supplied).

Having established the pertinence of *Scott v. Watson,* we turn to that opinion's answer to the first certified question:

> [W]e hold that *there is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated*

*by third parties on the landlord's premises.* Indeed, this is the general rule in other jurisdictions. In a somewhat analogous situation we noted, in *Nigido v. First Nat'l Bank,* 264 Md. 702, 288 A.2d 127 (1972), the absence of authority for the proposition that a bank owed a customer, shot by robbers in the course of a bank holdup, a special duty of protection; we said there that he was owed the same duty a shopkeeper owes his customer, to use reasonable care for his protection . . . .

The general rule is a subsidiary of the broader rule that a private person is under no special duty to protect another from criminal acts by a third person.

278 Md. at 166, 359 A.2d 548 (emphasis supplied). After further discussion, Chief Judge Murphy restated the Maryland law on the subject:

*[W]e decline to impose a special duty on a landlord to protect his tenants from criminal activity* since to do so would place him perilously close to the position of insurer of his tenants' safety. Our answer to the first certified question is that *Maryland law does not impose upon the landlord* of an urban apartment complex *a special duty to tenants to protect them from the criminal acts of third parties* committed in common areas within the landlord's control.

278 Md. at 167, 359 A.2d 548 (emphasis supplied).

### Foreseeability of Risk As Creating a Special Duty

The first certified question having been answered by the Court of Appeals in the negative, the second certified question now assumes pertinence. Might the foreseeability of future criminal activity, based on the knowledge of past criminal activity, create a duty to provide security even if the duty would not otherwise exist?

"(2) If no such duty exists generally, would such a duty be imposed if the landlord has knowledge of increasing

criminal activity on the premises or in the immediate neighborhood?"

278 Md. at 162, 359 A.2d 548.

Chief Judge Murphy, quoting from *Eyerly v. Baker*, 168 Md. 599, 607, 178 A. 691 (1935), responded to that question by stating that a duty may be enhanced or an additional duty created based on the foreseeability of the special risk:

> *[A] storekeeper who invites the public to come upon his premises [is held] to a "positive affirmative duty to protect them*, not only against dangers which may arise from some defect or unsafe condition of the physical property upon which they are invited to enter, but against dangers which may be caused by negligent acts of his employees, or even of customers, *where, as a reasonably prudent person, he should have anticipated the possible occurrence and the probable results of such acts."*

278 Md. at 166, 359 A.2d 548 (emphasis supplied).

The Court of Appeals then particularized that enhanced duty to the situation involving the perceived risk of crimes being committed against customers.

> If the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take *reasonable* measures, in view of the existing circumstances, to eliminate the conditions contributing to the criminal activity.

278 Md. at 169, 359 A.2d 548.

### Pertinent History of Criminal Incidents Confined to Premises And Not to Surrounding Neighborhood

As to the area covered by known criminal incidents and giving rise to the foreseeability of risk, the Court of Appeals confined the area to the storeowner's premises itself and not to the surrounding neighborhood.

> We think *this duty arises primarily from criminal activities existing on the landlord's premises, and not from knowledge of general criminal activities in the neighbor-*

*hood.* Every person in society is subject to the risk of personal injury or property damage from criminal activity, both inside and outside his abode. The risk obviously varies with the time and locale. Since the landlord can affect the risk only within his own premises, *ordinarily only criminal acts occurring on the landlord's premises,* and of which he knows or should have known *(and not those occurring generally in the surrounding neighborhood) constitute relevant factors in determining,* in the particular circumstances, *the reasonable measures which a landlord is under a duty to take to keep the premises safe.*

*Id.* (emphasis supplied).

### *Scott v. Watson* Consistently Followed

*Scott v. Watson* has been consistently followed as the settled law of this State. In *Hemmings v. Pelham Wood,* 144 Md. App. 311, 317–18, 797 A.2d 851 (2002), Judge Davis wrote for this Court:

This rule also applies to criminal acts of third parties; *"there is no special duty imposed upon the landlord to protect his or her tenants against crimes perpetrated by third parties on the landlord's premises." Scott,* 278 Md. at 166, 359 A.2d 548. However, *when it can be illustrated that the landlord had knowledge of increased criminal activity on the premises, a duty is imposed* on the landlord *to undertake reasonable measures to keep the premises secure. Id.* at 165, 359 A.2d 548.

(Emphasis supplied). See also *Valentine v. On Target,* 112 Md.App. 679, 686, 686 A.2d 636 (1996); *Valentine v. On Target,* 353 Md. 544, 551–52, 727 A.2d 947 (1999).

In applying what it interpreted to be prevailing Maryland law, the Fourth Circuit, in *Nails v. Community Realty Co.,* 166 F.3d 333, 1998 U.S.App. LEXIS 31576 (1998), cited *Scott v. Watson* as its authority and summarized its holding.

*There is no special duty imposed upon the landlord to protect his tenants against crimes perpetrated by third parties on the landlord's premises.* Rather, a landlord who

has set aside areas for the use of his tenants in common owes them the duty of reasonable and ordinary care to keep the premises safe. The landlord is not an insurer of tenants and is only obliged to use reasonable diligence and ordinary care to keep common areas in reasonably safe condition. ... *[I]f the landlord knows, or should know, of criminal activity against persons or property in the common areas, he then has a duty to take reasonable measures,* in view of the existing circumstances, *to eliminate the conditions contributing to the criminal activity. This duty arises primarily from criminal activities existing on the landlord's premises-not from knowledge of general criminal activities in the neighborhood.*

(Emphasis supplied).

In terms of foreseeability, there had been in *Nails* a purse snatch at knife point some four months earlier on the apartment parking lot in question. Even that, held the Fourth Circuit, was not enough to create a jury question on foreseeability so as to preclude summary judgment.

Relying on *Scott [v. Watson ] the district court found this sole instance of violent criminal conduct insufficient, as a matter of law, to create a duty* for Lake Arbor Towers *to provide all night security,* as urged by *Nails.*

(Emphasis supplied).

### Conclusion

In this case, there was no general duty on the part of Hightopps to protect its customers from possible crimes committed by third persons. Because there was no evidence of any prior crime having been committed against a customer on the premises, there was no foreseeability of risk so as to create a special duty in that regard. We affirm the decision of Judge Byrnes to grant summary judgment in favor of the appellee.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**