DANIEL SHAW *v.* DAVID R. GLICKMAN, Personal
Representative of the Estate of Leonard J. Gallant ET AL.

[No. 1210, September Term, 1979.]

*Decided June 13, 1980.*

The cause was argued before GILBERT, C. J., and
MACDANIEL and WEANT, JJ.

*Arnold Fleischmann* for appellant.

*E. Dale Adkins, III,* for appellees.

GILBERT, C. J., delivered the opinion of the Court.

This case concerns a new strand to an old yarn, the eternal

triangle.[1] It is new in that in addition to the usual cast, *le mari, la femme, et l'amant* (the husband, the wife, and the lover), new characters, the husband's "psychiatric team," have been joined as parties. In fact, the "team" has been sued for the injuries inflicted on *l'amant* by *le mari.*

The appellant, Dr. Daniel Shaw, a dentist, the husband, Leonard Billian, and Mr. Billian's former wife, Mary Ann Billian,[2] were all under the psychiatric care of the late Dr. Leonard J. Gallant, a psychiatric nurse known professionally as Patricia Hencke, but privately as Mrs. Gallant, and Mr. Joseph Napora, a psychologist. Sometime during the course of her therapy in 1974, the then Mrs. Billian left her husband. Subsequently, she "had two . . . [sessions] with Ms. Hencke along with . . . [Mr. Billian], which were more or less marriage counselling type appointments where she was talking to both of . . . [them]." At the first meeting of herself, her then husband, and Ms. Hencke, Mrs. Billian "told him [, Mr. Billian,] there was somebody. He did not seem terribly distraught about that." According to Mrs. Billian, Ms. Hencke informed the husband of the identity of the person in whom his wife was interested, Dr. Shaw.

Mrs. Billian continued to see Dr. Shaw and they conversed by telephone. The record is not clear as to the frequency of those events.

On April 26, 1974, the day following the last group therapy session that Dr. Shaw and Mrs. Billian attended that was conducted by Ms. Hencke, "Leonard Billian broke into Dr. Shaw's home at 2:00 A.M." At that time Dr. Shaw and Mrs. Billian were asleep in the same bed. Both were nude. Mr. Billian, obviously believing he had been cuckolded,[3] discharged five bullets into the body of Dr.

---

1. The phrase, eternal triangle, according to H. L. Mencken, *New Dictionary of Quotations on Historical Principles from Ancient and Modern Sources,* 1217 (1942), came into the English language from the Italian *triangolo equilatero.*

2. From the record, we learn that Mary Ann Billian is now Mary Ann Shaw as of March 10, 1977.

3. Dr. Shaw denied in his deposition that he and Mrs. Billian had been intimate, but he failed to answer a request for admission of fact "[t]hat the Plaintiff [Dr. Shaw] and Mary Ann Billian had, during the month prior to the shooting . . . engaged in sexual relations with each other." Thus, under Md. Rule 421 b 2, it is admitted.

720

Shaw.[4] Either Mr. Billian was a poor shot or an excellent
one, because none of the wounds were fatal.[5]

From the depositions that constitute a large part of the
record in this case, we learn that on the evening of April 26,
1974, a Friday, Dr. Shaw left his office at about 5:30 p.m.,
went to his residence in Cross Keys, "changed clothes [and]
went over to Mary Ann's mother's house and picked her
[Mary Ann] up." From there they journeyed to Curtis Bay
"and went to the wedding of a girl who worked for ...
[Shaw]." The dentist said that on the way back to "Mary
Ann's mother's house," at about 1 a.m. that night, he fell
asleep at the wheel. Dr. Shaw attributed that to his having
been up from 5 a.m. the preceding day. Shaw said that he
told Mrs. Billian that he could manage to drive her to her
mother's, but he did not see how he was "going to stay awake
driving back from ... [the] mother's house ... to Cross
Keys." Consequently, at Pimlico, on Northern Parkway, he
"turned around and went back to ... [his] apartment, and
went to bed, and a very few moments after we put out the
lights to go to sleep, somebody entered the apartment and
shot me."

Sometime earlier in the evening of the shooting, Mrs.
Billian had spoken to her son, Michael. That conversation,

---

**4.** Sir William Blackstone, in 4 *Commentaries on the Laws of England*
* 191-92, says: "So, if a man takes another in the act of adultery with his wife
and kills him directly upon the spot, though this was allowed by the laws of
Solon, as likewise by the Roman civil law, (if the adulterer was found in the
husband's own house,) and also among the ancient Goths, yet in England it is
not absolutely ranked in the class of justifiable homicide, as in case of forcible
rape, but it is manslaughter. It is, however, the lowest degree of it; and
therefore in such a case the court directed the burning in the hand to be
gently inflicted, because there could not be a greater provocation."
(Footnotes omitted).

Some states by statute have eliminated the slaying by husband of the wife's
lover as a crime, provided the husband comes upon his wife and her lover
"in the act of adultery ... [and] the killing take[s] place before the parties
to the act have separated." 2 Vernon's Statutes, Penal Code (1948) ch. 12,
art. 1220. *See generally,* J. M. Kerr, *A Treatise on the Law of Homicide.*
§ 193 (1891).

For an early American decision adhering to Blackstone, read State v.
Samuel, 48 N.C. (3 Jones) 74 (1855).

**5.** Mr. Billian was convicted of assault. Mrs. Billian obviously by then
divorced, married Dr. Shaw. Shaw "made a claim against" Mr. Billian for
the injuries caused by Billian. The claim "was settled for $20,000."

related to Dr. Shaw, was to the effect that "Leonard Billian was acting in a bizarre way, and he was walking around with a pistol, with a gun belt and a pistol." That fact, however, did not alarm Shaw because Shaw "had no notion he [Billian] would be prowling around at 2 o'clock in the morning."

Dr. Shaw, in his deposition, said that he had, "at the beginning of either the session [with Dr. Gallant] before the shooting or the week before that when we began our session, ... [expressed] some concern about the possibility — this is a paraphrase — of violence from Leonard Billian." Shaw stated that Dr. Gallant was concerned that Shaw "appeared to be developing a relationship" with an immature person. Dr. Gallant, according to Shaw, "brushed aside ... [Shaw's] expression of concern" relative to Mr. Billian with the remark that " 'We have got to get on to other things. We don't have to be concerned about that.' "

Shaw's suit against the "psychiatric team" [6] was grounded on the theory of their negligence in failing to warn Shaw of Billian's "unstable and violent condition and the foreseeable and immediate danger that it presented to" Shaw.

The suit was met by the usual general issue pleas. Discovery followed. Ultimately, the psychiatric trio moved for a summary judgment. They asserted that "there is no duty in the State imposed upon psychiatrists or psychotherapists to warn a potential victim of the violent propensities of any person, whether a patient or otherwise, of that psychiatrist or psychotherapist." Moreover, the "team" maintained even if such a duty existed, Dr. Shaw "assumed the risk of being assaulted by Leonard Billian and was contributorily negligent [as matter of law] in taking off his clothes and going to bed with [the equally nude] Mrs. Billian on April 27, 1974."

Judge Grady, as we have previously stated, granted the

---

6. Dr. Gallant's estate is represented by his personal representatives. Inasmuch as no claim had been filed against Dr. Gallant's estate within the prescribed time. See Md. Estates and Trusts Code Ann. (1974) § 8-103, recovery against the estate was barred. The late doctor's liability insurance carrier, however, is not protected by the time passage.

motion for summary judgment because Shaw "assumed the risk of the injury. The Court conclude[d] that immediately before . . . [Shaw] was injured he voluntarily placed himself in a situation involving a danger to himself which was so obvious and apparent that . . . [Shaw] either knew or should have known of the danger involved. . . ."

Patently aggrieved at the decision of the Superior Court of Baltimore City, Shaw has carried his cause here where he contends:

"I.  A psychiatrist, who determines or should determine that a person presents a foreseeable danger of violence to one of his patients, incurs a duty to exercise reasonable care to prevent the threatened violence.

II.  When a psychiatrist, who determines or should determine that a person presents a foreseeable danger of violence to one of his patients, incurs a duty to exercise reasonable care to prevent the threatened violence, the rule of privileged communications does not bar him from taking protective measures.

III.  When a psychiatrist, who determines or should determine that a person presents a foreseeable danger of violence to one of his patients, incurs a duty to exercise reasonable care to prevent the threatened violence, the failure to exercise such reasonable care is the proximate cause of the injuries.

IV.  A victim of criminal activity, who voluntarily places himself in his bed with the assailant's wife, does not assume the risk of injury at the hands of the assailant and is not barred from recovering for such injury."

We think that the four issues framed by Shaw should be rephrased into one, and that is, did the Superior Court err in granting a summary judgment for the appellees? We think the court did err. Nevertheless, the error will avail Shaw of

naught except a return to the Superior Court where his case will be dismissed because under the peculiar circumstances out of which this matter arises, no cause of action against the three appellees exists. In short, while we think the hearing judge was wrong in his reasons, he was right in his ultimate result.

Shaw points to *Tarasoff v. Regents of the University of California,* 17 Cal. 3rd 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976), as authority for the proposition that the psychotherapist-patient relationship imposes on the therapists a duty to control his patient and the concomitant duty to protect the patient's would-be victim.

In *Tarasoff,* the facts were that Prosenjit Poddar [7] killed Tatiana Tarasoff. Tatiana's parents sued a number of persons [8] as well as the Regents of the University of California, alleging that Poddar had confided his intent to slay Tatiana to a Dr. Moore, a psychologist employed by the Cowell Memorial Hospital at the University of California at Berkeley. Moore contacted the campus police who detained Poddar briefly. Because he appeared rational, the police released him. No one warned Tatiana of Poddar's threats. The slaying of Tatiana occurred approximately 67 days after Poddar had confided to Moore that he would kill her.

The Superior Court, Alameda County, sustained, on behalf of all defendants, a demurrer without leave to amend. The complaint consisted of four parts. The first was called "Failure to Detain a Dangerous Patient"; the second was entitled "Failure to Warn On a Dangerous Patient"; the third was named "Abandonment of a Dangerous Patient"; the fourth was styled "Breach of Primary Duty to Patient and the Public." The first and fourth "causes of action" were, in the words of the Supreme Court of California, "legally indistinguishable." The first and fourth causes failed to penetrate the invisible shield of sovereign immunity. The third cause fell victim to the California appellate decisions

---

7. The criminal case is reported in People v. Poddar, 10 Cal. 3rd 750, 111 Cal. Rptr. 910, 518 P.2d 342 (1974).

8. *See* n. 2, 17 Cal. 3rd at 430, 131 Cal. Rptr. at 20, 551 P.2d at 340.

precluding exemplary damages in wrongful death cases. The *Tarasoff* Court, in a split decision held that:

> "[T]he special relation that arises between a patient and his doctor or psychotherapist . . . may support affirmative duties for the benefit of third persons. Thus, for example, a hospital must exercise reasonable care to control the behavior of a patient which may endanger other persons. A doctor must also warn a patient if the patient's condition or medication renders certain conduct, such as driving a car, dangerous to others." (Footnotes omitted.) 17 Cal. 3rd at 436, 131 Cal. Rptr. at 23-24, 551 P.2d at 343-44.

Aside from *Tarasoff*, there is authority to the effect that "the therapist becomes sufficiently involved to assume some responsibility for the safety, not only of the patient himself, but also of any third person whom the doctor knows to be threatened by the patient." Fleming & Maximov, *The Patient or His Victim: The Therapist's Dilemma* (1974) 62 Cal, L. Rev. 1025, 1030. *See also Merchants National Bank & Trust Co. of Fargo v. United States,* 272 F. Supp. 409 (D.N.D. 1967).

The Court, in *Tarasoff,* noted that there was no question of a missed diagnosis or failure to predict the future conduct of the patient. What was involved was the fact that the patient did tell the therapist of the plan to kill Tatiana, and the therapist, while correctly predicting the event, negligently failed to warn the victim.

The court turned away the contention that "the therapist should be absolved of any responsibility for failing to act to protect the potential victim." Rather the court opined that "once a therapist . . . determine[s] or under applicable professional standards reasonably should have determined, that a patient poses a serious danger of violence to others, he bears a duty to exercise reasonable care to protect the foreseeable victim of that danger." 17 Cal. 3rd at 439, 131 Cal. Rptr. at 25, 551 P.2d at 345. The court concluded that each case must stand on its own facts, as measured against

traditional negligence standards of reasonable care under the circumstances.

We neither accept nor reject the rationale of *Tarasoff* because, in our view, it is inapposite to the instant case.

Here there was no threat revealed to the "team" by Billian to kill or injure Dr. Shaw; there was apparently no confiding by Billian in the doctor or his staff, concerning any animosity or hatred toward Dr. Shaw. The record, at least, is devoid of the existence of any such feeling. Although Billian was known by Dr. Gallant to tote a gun, that fact does not give rise to the inference that Billian did so for the purpose of harming Dr. Shaw. The matter *sub judice* is unlike *Tarasoff* in that the intent to kill or injure was not disclosed.

Underlying Dr. Gallant's obligation to his patients was the Hippocratic oath. That oath, in pertinent part, states: "All that may come to my knowledge in the exercise of my profession or outside of my profession or in daily commerce with men, which ought not to be spread abroad, I will keep secret and will never reveal."

Of course, it may be argued that when, as in *Tarasoff,* a patient informs a doctor of the patient's plan to kill another person, such information is not within the proscription of the Hippocratic oath, but rather "ought to be spread abroad" in order to prevent injury or loss of life. Clearly, had Billian confided in Dr. Gallant, or any of the team, that he, Billian, planned to shoot Dr. Shaw, Dr. Gallant would have faced a dilemma, *i.e.,* to breach Billian's confidence and tip off Shaw, or keep Billian's confidence and, figuratively speaking, throw Shaw to the wolves.

Even that dilemma is not without some legislative guidance. Md. Courts and Judicial Proceedings Code Ann. (1974) § 9-109 (b) provides:

"Unless otherwise provided, in all judicial, legislative, or administrative proceedings, a patient or his authorized representative has a privilege to refuse to disclose, and to prevent a witness from

disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder."

The privilege against disclosure belongs to the patient, not the psychiatrist or psychologist. *Bremer v. State,* 18 Md. App. 291, 307 A.2d 503 (1973), *cert. denied,* 415 U.S. 930 (1974).

The statute provides also for the exceptions to its tenets Courts Art. § 9-109(d). None of the exceptions are germane to the issue before us, however.[9] It seems to us that inasmuch as the statute confers a privilege of confidentiality on the communication between patient and psychiatrist-psychologist in judicial, legislative, or administrative proceedings, which privilege is that of the patient, no lesser privilege is existent when the matter is not judicial, legislative, or administrative. With the exception of those instances where the privilege of confidentiality is expressly prohibited,[10] the lips of the psychiatrist or

---

**9.** Courts Art. § 9-109 provides in part:

"(d) *Exclusion of privilege.* There is no privilege if:

(1) A disclosure is necessary for the purposes of placing the patient in a facility for mental illness;

(2) A judge finds that the patient, after being informed there will be no privilege, makes communications in the course of an examination ordered by the court and the issue at trial involves his mental or emotional disorder;

(3) In a civil or criminal proceeding:

(i) The patient introduces his mental condition as an element of his claim or defense; or

(ii) After the patient's death, his mental condition is introduced by any party claiming or defending through or as a beneficiary of the patient;

(4) The patient, his authorized representative, or his personal representative makes a claim against the psychiatrist or certified psychologist for malpractice;

(5) Related to civil or criminal proceedings under defective delinquency proceedings; or

(6) The patient expressly consents to waive the privilege, or in the case of death or disability, his personal or authorized representative waives the privilege for purpose of making claim or bringing suit on a policy of insurance on life, health, or physical condition."

**10.** *Ibid.*

psychologist have been statutorily sealed shut subject solely to being unsealed by the patient or the patient's authorized representative.[11]

We hold that under current Maryland law, it would have been a violation of the statute for Dr. Gallant or any member of his psychiatric team to disclose to Dr. Shaw any propensity on the part of Billian to invoke the old Solon law and shoot his wife's lover.

We are not to be understood as sanctioning Billian's taking the law into his own hands. Maryland is still subject to the common law, except where it has been changed or modified by legislative action. Maryland Declaration of Rights, Article V. We have seen that at common law the irate husband could not lawfully dispose of his wife's paramour even when he happened upon them in *flagrante delicto.* The law provides adequate redress to the cuckolded husband, in the form of a divorce on the ground of adultery, or a criminal prosecution against the interloper for adultery, or a combination of the remedies. Prior to the recent decision of the Court of Appeals in *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980), the husband could have also maintained an action for criminal conversation.

Because we believe no cause of action exists on the part of Dr. Shaw against the psychiatric team, under the circumstances of this case, we affirm the judgment of the Superior Court of Baltimore.

*Judgment affirmed.*
*Costs to be paid by appellant.*

---

11. Courts Art. § 9-109 (a) defines "authorized representative" to mean "a person authorized by the patient to assert the privilege granted by this section and until permitted by the patient to make disclosure, the person whose communications are privileged."