742 A.2d 51

**John FALK, Personal Representative
of the Estate of Elene Seibert**

v.

**SOUTHERN MARYLAND HOSPITAL, INC., et al.**

**No. 1924, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Dec. 7, 1999.

Christopher A. Aragona (Aragona & Aragona, on the brief), Oxon Hill, for Appellant.

Michael I. Joseph (Godard, West & Adelman, on the brief), Rockville, for Appellee, Southern MD Hosp.

Andrew E. Vernick (Michael K. Wiggins and Wharton, Levin, Ehrmantraut, Klein & Nash, on the brief), Annapolis, for Appellee, Sadri.

Argued before THIEME, SONNER, and THEODORE G. BLOOM (retired, specially assigned), JJ.

SONNER, Judge.

In this case, appellant, John Falk, acting as personal representative of the estate of his mother, Elene Seibert, filed a medical malpractice suit in the Circuit Court for Prince George's County against Dr. Martin Giller, Dr. Manouchehr Sadri, and Southern Maryland Hospital Center, Inc. The complaint alleged that on April 11, 1991, Daniel Ferguson, a twenty-one-year-old psychiatric patient who had been admitted involuntarily to Southern Maryland Hospital's locked-down psychiatric ward eleven days earlier, struck psychiatric nurse Stanley Green with his fist, after two other nurses had refused to grant his request for medication.[1] Green then fell over and knocked down Elene Seibert, who, at that time, was a patient in the same unit. As a result of her fall, Seibert suffered a broken hip and had to have surgery. She died from surgery-related complications on April 30th at the age of eighty-seven.

Falk's suit alleged that it was Dr. Giller, Dr. Sadri, and Southern Maryland Hospital's responsibility to supervise Ferguson and protect Seibert from Ferguson, and that Seibert's death was a direct result of their failure to do so.[2] The defendants moved to dismiss, or in the alternative, for sum-

---

1. Ferguson was admitted pursuant to MD.CODE (1994, 1998 Supp.), Health-Gen. I, §§ 10–613 through 10–619, which constitutes the statutory scheme covering involuntary admissions to public health facilities.

2. Counts I–III of the complaint were wrongful death claims against each defendant. Counts IV–VI of the complaint were survival claims against each defendant. Count VII was a separate fraud claim against Southern Maryland Hospital. Plaintiffs voluntarily dismissed Counts I–III at the first summary judgment hearing.

mary judgment based on § 5–609[3] of the Courts and Judicial Proceedings article of the Maryland Code, which governs the liability of mental health care providers for the behavior of their patients.

On September 27, 1996, the court granted Dr. Giller's motion to dismiss, ruling that the plaintiff failed to show how Dr. Giller, as Seibert's treating psychiatrist, could be responsible for Ferguson's attack. The court ordered the suit to proceed against Dr. Sadri, who was Ferguson's treating psychiatrist, and Southern Maryland Hospital to permit the parties to develop additional facts during discovery. On December 3, 1997, however, the court granted Dr. Sadri's motion for summary judgment, finding that the plaintiff failed to make out a viable claim under § 5–609. And on October 1, 1998, the court granted summary judgment in favor of Southern Maryland Hospital, based on the same statute. The sole issue now on appeal is whether the court properly applied this statute in granting summary judgment in favor of appellees, Dr. Sadri and Southern Maryland Hospital.[4]

In reviewing the granting of summary judgment, we determine whether the trial court was legally correct. *Imperial v. Drapeau*, 351 Md. 38, 44, 716 A.2d 244 (1998). Summary judgment is proper when "there is no genuine dispute as to any material fact and ... the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(e).

Section 5–609 in pertinent part provides:

(b) *In general.*—A cause of action or disciplinary action may not arise against any mental health care provider or administrator for failing to predict, warn of, or take precautions to provide protection from a patient's violent behavior unless the mental health care provider or administrator knew of the patient's propensity for violence and the patient

---

3. This provision was transferred to § 5–316, effective Apr. 8, 1997, without change.

4. Appellant does not appeal the judgment in favor of Dr. Giller.

indicated to the mental health care provider or administrator, by speech, conduct, or writing, of the patient's intention to inflict imminent physical injury upon **a specified victim or group of victims**.

(Emphasis added.)

When the language of a statute is clear, our role "is simply to construe the provision in accordance with the plain meaning of the text." *Sears, Roebuck & Co. v. Gussin,* 350 Md. 552, 562, 714 A.2d 188 (1998). Stated differently, "in the absence of evidence to the contrary, we assume that the words of the statute are intended to have their natural, ordinary and generally understood meaning." *Lombardi v. Montgomery County,* 108 Md.App. 695, 702, 673 A.2d 762 (1996) (citations omitted). We read § 5–609 as stating that a mental health provider is not liable for the violent behavior of his or her patients unless he or she 1) had actual knowledge of the patient's propensity for violence; **and** 2) the patient indicated to the mental health provider in some way that he or she intended to harm **a specific victim.**

Although there is no case law interpreting this fairly new statute, the wording of the statute is entirely consistent with the reasoning in three Maryland cases that have discussed this subject in depth. In *Furr v. Spring Grove State Hosp.,* 53 Md.App. 474, 454 A.2d 414 (1983), this Court held that a state psychiatrist was not responsible for the rape and murder of a young boy by a patient who left the state hospital where he was receiving treatment for deviant sexual behavior. (The patient was entitled to leave the hospital without notifying the medical staff because he was a voluntary admittee.) In declining to adopt the reasoning in the seminal case of *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976), we held that the psychiatrist owed no duty to the victim because the victim was an unforeseeable plaintiff. In doing so, we pointed out that *Tarasoff* imposed a duty only when the mental health provider knew the identity of the specific victim who was threatened. *Furr,* 53 Md.App. at 487–88, 454 A.2d 414.

Second, in the case of *Shaw v. Glickman,* 45 Md.App. 718, 415 A.2d 625 (1980), a decision that neither rejected nor applied the rationale of *Tarasoff,* this Court, speaking through Chief Judge Gilbert, declined to hold a psychiatrist or his staff liable for gunshot injuries inflicted by an irate cuckolded husband on his wife's paramour. During a therapy session, the "psychiatric team" had learned that the irate husband had been acting in a bizarre way and wearing a gunbelt and a pistol. Since the husband did not reveal an intent to injure the paramour, we held that the paramour could not maintain a cause of action against the husband for his injuries. *Id.* at 725, 415 A.2d 625.

Likewise, in *Hartford Ins. Co. v. Manor Inn of Bethesda, Inc.,* 335 Md. 135, 642 A.2d 219 (1994), the Court held that the State owed no duty toward a victim of a car accident between the victim and a psychiatric patient who had eloped from a state hospital. The patient, who had been voluntarily committed to Springfield State Hospital Center in Carroll County, Maryland, resurfaced in Bethesda, Maryland, where police officers, believing that he was homeless, checked him into a hotel for the night. The next morning, the patient entered the van of a hotel employee, who had left the vehicle unattended with the keys in the ignition. The patient ended up negligently crashing the van into the victim's car. The Court stated:

> The record is unclear as to the nature or cause of [the patient's] dangerousness. That is an important ingredient in determining whether, and, if so, the extent to which, the State owed a duty to [the victim]. It does not appear, however, that [the patient's] dangerousness involved eloping from State mental institutions and stealing automobiles, which he then crashed into other automobiles. Moreover, it could not be foreseen that Griffin, having eloped, would go to Bethesda, steal a van, and drive it negligently, thus causing an accident.

*Manor Inn,* 335 Md. at 151, 642 A.2d 219.

The present case is similar to *Palsgraf v. Long Island R.R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928), a case that the Court in

*Manor Inn* discusses at length. In *Palsgraf,* the court held that Mrs. Palsgraf could not recover for her injuries when a passenger, who was trying to catch a moving train with the help of railroad employees, accidentally dropped a wrapped package of explosives that fell onto the tracks and exploded, causing a set of scales at the other end of the platform to fall on her. The court deemed Mrs. Palsgraf to be an unforeseeable plaintiff who was outside the "zone of danger." *See id.* at 103 (Andrews, J. dissenting). And, in *Manor Inn,* recognizing a *"Palsgraf* problem," the Court concluded that the duty of psychiatrists did not run to the public at large, but, rather, only to readily identifiable victims, *"i.e.* those within a foreseeable zone of danger whose identities are known in advance." *Id.* at 154, 642 A.2d 219. Applying the reasoning from those cases, appellant's claim is extremely tenuous. We would be hard-pressed to say, as a matter of law, that the lower court erred in finding that Seibert was an unforeseeable victim. In situations such as this one, however, we need no longer speculate as to foreseeability because the statute specifically outlines the duty a psychiatrist owes a plaintiff.

Appellant contends that he has produced enough evidence to make out a claim under the statute. He argues that the notes in Ferguson's medical chart indicated to appellees that Ferguson needed to be placed in isolation in order to protect the other patients and employees on the same floor. According to appellant, the record reveals that throughout Ferguson's stay at Southern Maryland Hospital, he was hostile, combative, delusional, and paranoid. Ferguson demonstrated anger toward the nurses and staff, assaulted female patients by grabbing and touching them, and repeatedly requested medication in order "to control" his behavior. Appellant emphasizes that Ferguson was held in four-point restraints [5] for approximately four hours on the day after his admission, and one week later, he picked up a large nail that the staff had to take away from him. Appellant also describes an incident that occurred when

---

**5.** Ferguson had physical restraints attaching each of his wrists and ankles to a bed to prevent him from harming himself or others.

he was visiting Seibert's room on April 10th. Seibert had slid onto the floor while trying to get out of bed. A nurse then asked Ferguson to exchange beds with Seibert so that Seibert could have a bed lower to the ground, and appellant noticed that Ferguson, who was upset that he had given up his bed, looked at Seibert "in a hateful way."

Appellant also relies on the opinion of his psychiatric expert, Dr. Robert Toborowski, who testified at his deposition that he did not approve of Dr. Sadri's treatment of Ferguson. Dr. Toborowski also testified that factors indicating Ferguson's violent propensities include being a young, unemployed, adult male diagnosed with paranoid schizophrenia with a history of drug abuse. Yet, Dr. Toborowski admitted that Ferguson was described as "violent" only one night during his twelve-day stay prior to the incident involving Seibert, and that the hospital records did not indicate that Ferguson intended to harm Seibert.

■ Even weighing the evidence in the light most favorable to appellant, as we are required to do when reviewing a summary judgment decision, *Dobbins v. Washington Suburban Sanitary Comm'n*, 338 Md. 341, 345, 658 A.2d 675 (1995), we hold that appellant has failed to meet the requirements of § 5–609 to establish a claim against either Dr. Sadri or Southern Maryland Hospital. The evidence simply does not demonstrate that Ferguson informed the hospital staff that he intended to harm a particular person or group of persons. Accordingly, we affirm the judgments of the lower court.

**JUDGMENTS AFFIRMED.**

**APPELLANT TO PAY COSTS.**