*Jacob Caples, et al. v. Sinai Hospital of Baltimore, Inc., et al.*, No. 1527, September Term, 2024. Opinion by Ripken, J.

**IMMUNITY – HEALTH – ACTS OF MENTAL HEALTH PATIENTS – DUTY OF PSYCHIATRIC PROFESSIONALS**

Section 5-609 of the Courts and Judicial Proceedings Article generally shields certain mental health care providers from civil liability for failure to warn of a patient's violent behavior. Immunity under this statute does not extend to mental health providers or administrators if 1) the provider or administrator could have readily identified the victim as a potential target from interactions with the patient prior to the harm inflicted, and 2) the victim was in a foreseeable zone of danger. Where a patient expresses violent ideation toward those in their vicinity, at a minimum, the provider or administrator must warn those to whom the patient is being discharged.

Circuit Court for Baltimore City
Case No. 24-C-24-001715

IN THE APPELLATE COURT

OF MARYLAND

No. 1527

September Term, 2024

_____

JACOB CAPLES, ET AL.

v.

SINAI HOSPITAL OF BALTIMORE, INC.,

ET AL.

_____

Zic,
Ripken,
Eyler, James R.,
    (Senior Judge, Specially Assigned),

JJ.
_____

Opinion by Ripken, J.
_____

Filed: May 1, 2026

This appeal involves a challenge to the grant of a motion to dismiss by the Circuit Court for Baltimore City. In November of 2020, Jeffrey Caples ("Caples") was an inpatient at Sinai Hospital of Baltimore, Inc. ("Sinai"), receiving psychiatric treatment after experiencing suicidal ideation. While under Sinai's care, it is contended that on at least two occasions, Caples expressed to Sinai staff that he had homicidal ideation. Specifically, it is asserted that on two different occasions during his hospitalization, Caples told Sinai staff that he wanted to kill "anyone that came near him" and "anyone who comes close[,]" respectively. The same day that Caples voiced his second iteration of homicidal ideation, Sinai discharged Caples into the care of his wife, Kelly Ann Caples ("Decedent"), without notifying her or Caples' outpatient psychiatric care provider of this onset of homicidal ideation. Eight days later, Caples killed Decedent at home. In April of 2024, appellants, Jacob Caples, Benjamin Caples,[1] and Howard Fitzgerald, Jr. (collectively, "Decedent's Survivors")[2,3] filed this wrongful death and survival action against appellees, Sinai and

---

[1] Jacob Caples and Benjamin Caples are the adult sons of Caples and Decedent. They brought this action on behalf of themselves and as co-representatives of The Estate of Kelly Ann Caples.

[2] Howard Fitzgerald, Jr. is Decedent's father.

[3] "To the Use of Jeffrey Caples" is also a named plaintiff in the suit. In a wrongful death action, "[a]ll persons who are or may be entitled by law to claim damages by reason of the wrongful death shall be named as plaintiffs whether or not they join in the action. The words 'to the use of' shall precede the name of any person named as a plaintiff who does not join in the action." Md. Rule 15-1001(b); *see also Carter v. Wallace & Gale Asbestos Settlement Trust*, 439 Md. 333, 336 n.1 (2014) (brackets, quotation marks, and citations omitted) ("A use plaintiff in common law pleadings is a plaintiff for whom an action is brought in another's name, and who does not join in the action[.]").

Ashley McKenzie,[4] the nurse practitioner who discharged Caples. Sinai filed a motion to dismiss, asserting, among other contentions, that Maryland Code, (1989, 2020 Repl. Vol.), section 5-609 of the Courts and Judicial Proceedings Article ("CJP"), provided them with immunity from suit. The court conducted a hearing in August of 2024 and subsequently dismissed the action in September of 2024, holding that CJP section 5-609 precluded the suit. Decedent's Survivors filed this timely appeal and present the following issue for our review:[5]

> Whether the circuit court erred in granting the motion to dismiss pursuant to CJP section 5-609.

For the reasons to follow, we shall reverse the judgment of the circuit court.

---

[4] "[I]t is hornbook law that an employer is ordinarily responsible for the tortious conduct of [its] employee committed while the [employee] was acting within the scope of the employment authority." *Barclay v. Briscoe*, 427 Md. 270, 282 (2012). Accordingly, unless otherwise specified, we will also attribute any conduct by medical providers below collectively to Sinai, as the hospital makes no claims that the medical providers involved in Caples' care were not employees or acted beyond the scope of their employment.

[5] Rephrased from:

> Whether the Circuit Court appropriately applied Md. Code Ann., Cts. & Jud. P., § 5-609 and dismissed this case prior to any discovery taking place after Appellees discharged Mr. Caples "home to wife" without warning her of the danger she faced even though Mr. Caples' medical records evidence[d] a propensity for violence and direct threats to kill anyone who came near him.

## FACTUAL AND PROCEDURAL BACKGROUND

*Underlying Facts[6]*

On November 17, 2020, Caples presented to the emergency room at The Johns Hopkins Hospital in Baltimore, complaining of suicidal ideation with a plan to cut himself with a knife. Later that day, Caples was transferred to the inpatient psychiatric unit at Sinai for voluntary admission.[7] In its initial assessment, Sinai documented that Caples was suicidal and had a history of such ideation. The assessment also noted that Caples had paranoid thoughts and catatonic symptoms.[8] Thereafter, Sinai made several treatment notes coinciding with the dates of Caples' hospitalization. In pertinent part, the notes relayed the following:

November 19, 2020

Caples denied being suicidal or homicidal.

---

[6] The underlying facts are adduced from the complaint. *See Williams v. Peninsula Reg'l Med. Ctr.*, 213 Md. App. 644, 651 (2013) (On review of the grant of a motion to dismiss, "[a]n appellate court should presume the truth of all well-pleaded facts in the complaint, along with any reasonable inferences derived therefrom."), *aff'd*, 440 Md. 573 (2014). "Consideration of the universe of 'facts' pertinent to the court's analysis of the motion [is] limited generally to the four corners of the complaint and its incorporated supporting exhibits, if any." *RRC Ne., LLC v. BAA Maryland, Inc.*, 413 Md. 638, 643 (2010). Here, a case summary prepared by Dr. Jeffrey Janofsky (the "Janofsky Attachment") is attached to the complaint as a supporting exhibit and purports to be based on medical records documenting Caples' hospitalization at The Johns Hopkins Hospital and Sinai. Accordingly, we rely on this document as part of the complaint to generate the underlying facts. *See id.*

[7] The complaint also indicates that The Johns Hopkins Hospital "planned to certify [Caples] for involuntary admission if he declined voluntary admission."

[8] The Janofsky Attachment also indicates that Caples had "paranoid thoughts."

3

November 20, 2020

Caples was documented as positive for suicidal ideation without a plan or intent while hospitalized at Sinai. He voluntarily placed himself on a seventy-two-hour hold and agreed to stay at Sinai for further stabilization. He was not amenable to intensive outpatient or partial hospital programs.

November 21, 2020

Caples was documented as depressed and irritable with impaired judgment and impulse control. In addition, Caples was given an assessment form by Sinai staff on which Caples did not check the boxes indicating that he was *not* having suicidal or homicidal ideation.

November 22, 2020

At approximately 9:30 a.m., Caples verbalized that he was "always" suicidal and indicated that he had a plan to hurt himself with a knife. Caples was positive for homicidal ideation "towards anyone who comes close." However, it was noted that he "does contract for safety[.]"[9] In addition, Caples was given an assessment form by Sinai staff on which Caples again did not check the boxes indicating that he was *not* having suicidal or homicidal ideation.

November 23, 2020

Caples was suicidal without a plan or intent and denied being homicidal. He agreed to retract his seventy-two-hour hold, which was expiring, and was amenable to outpatient treatment. His insight was guarded, and judgment was fair. However, his impulse control was impaired.[10]

At 11:08 p.m., Caples was documented as showing no signs of psychological distress and denying all psychological symptoms.

---

[9] At argument, Sinai indicated that to "contract for safety" means that the patient agrees not to carry out their thoughts of harm, and that this meaning is in line with medical dictionaries.

[10] It appears that this assessment was conducted prior to the second progress note, which was recorded at 11:08 p.m. that day.

<u>November 24, 2020</u>

At approximately 6:00 a.m., Caples expressed that he "always" has suicidal ideation and that he had a plan of hurting himself with a knife.[11] Caples also had homicidal ideation "towards anyone who comes close[.]" However, it was noted that he "does contract for safety[.]"

At approximately 10 a.m., Caples denied suicidal and homicidal ideation and "[l]eft with his wife to return home."

McKenzie completed and signed Caples' discharge summary. In relevant part, it stated that Caples had been voluntarily admitted for observation and listed the treatment and medication he received while hospitalized. The summary also indicated that Caples' mood had improved and that his suicidal ideation had remitted. However, Caples was noted to have had recent episodes of aggression for which he had to be medicated.[12] In addition, the summary noted that Caples had a family call with his wife to discuss discharge and safety planning. While the summary indicated that Caples denied homicidal ideation, the summary made no mention that he had homicidal ideation while hospitalized.

On December 2, 2020, eight days after his release, Caples bludgeoned and stabbed Decedent to death in their home. Caples was subsequently charged with murder and entered an *Alford* plea.[13] Following the entry of the plea, the court found Caples guilty of first-

---

[11] Sinai staff indicated that this progress note was a "corrected result[.]"

[12] This fact is not contained in the body of the complaint however is found in the Janofsky Attachment.

[13] An *Alford* plea is a guilty plea "containing a protestation of innocence." *Tolson v. State*, 201 Md. App. 512, 514 (2011) (quoting *Bishop v. State*, 417 Md. 1, 19 (2010)) (further citation and internal quotation marks omitted).

degree murder. As Caples had also entered a plea of not criminally responsible, a bench trial was conducted on that issue. Caples was found criminally responsible and was subsequently sentenced to life imprisonment.[14]

*Procedural History*

In April of 2024, Decedent's Survivors filed the instant action, alleging that Sinai's negligence led to Decedent's death. In response, Sinai filed a motion to dismiss, primarily asserting that CJP section 5-609 shielded them from suit.[15] The circuit court held a hearing on the motion in August of 2024, and at the conclusion of argument by both sides, granted the motion to dismiss. The court found that Caples' homicidal statements did not expressly identify Decedent as a target such that Sinai would have had a duty to warn her. Accordingly, the court found that CJP section 5-609 provided Sinai with immunity from suit and dismissed the action. This timely appeal followed.

---

[14] While appellate review of a motion to dismiss is generally confined to the universe of facts within the four corners of a complaint and its incorporated supporting exhibits, we may also take judicial notice of facts "known within the Court's territorial jurisdiction or capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *Charles v. Charles*, 265 Md. App. 631, 649 (2025) (internal citations, brackets, and quotation marks omitted). This includes information in public records such as court documents. *Id.* Accordingly, although the information regarding Caples' criminal conviction was not contained in the complaint, we have ascertained it via public record. *See State v. Caples*, Circuit Court for Carroll County case number C-06-CR-21-000037.

[15] In general, CJP section 5-609 shields certain mental health care providers from civil liability for failure to "predict, warn of, or take precautions to provide protection from a patient's violent behavior unless the mental health care provider or administrator knew of the patient's propensity for violence and the patient indicated to the mental health care provider or administrator, by speech, conduct, or writing, of the patient's intention to inflict imminent physical injury upon a specified victim or group of victims." CJP § 5-609(b).

Additional facts will be incorporated below as relevant.

## DISCUSSION

### THE CIRCUIT COURT ERRED IN GRANTING THE MOTION TO DISMISS.

### A. Party Contentions

Decedent's Survivors assert that the circuit court erred in granting the motion to dismiss. Specifically, Decedent's Survivors contend that they pled sufficient facts to demonstrate that Sinai knew of Caples' propensity for violence and the imminent risk to Decedent, thus stripping Sinai and McKenzie of CJP section 5-609 immunity. Decedent's Survivors also argue that Sinai and McKenzie's reliance on this Court's decision in *Falk v. Southern Maryland Hospital, Inc.*, 129 Md. App. 402 (1999), is misplaced because the facts in that case and those *sub judice* are distinguishable.

Sinai contends that the circuit court's dismissal of the complaint was legally correct. Specifically, Sinai argues that CJP section 5-609 provides it with immunity from suit because Caples' homicidal statements did not indicate that he posed a threat to a specific victim or group of victims when released. Sinai further asserts that the homicidal statements did not communicate an intent to inflict imminent physical harm. Last, relying on this Court's decision in *Falk*, Sinai argues that the homicidal statements and Caples' behavior while under Sinai's care did not indicate that Caples had a propensity for violence.

### B. Standard of Review

"[W]e review [*de novo*] the grant of a motion to dismiss[.]" *Reiner v. Ehrlich*, 212 Md. App. 142, 151 (2013) (alterations omitted) (quoting *Gomez v. Jackson Hewitt, Inc.*, 427 Md. 128, 142 (2012). In so doing, "we must determine whether the complaint, on its

7

face, discloses a legally sufficient cause of action." *Williams v. Peninsula Reg'l Med. Ctr.*, 213 Md. App. 644, 651 (2013) (citation omitted), *aff'd*, 440 Md. 573 (2014). We must assume the truth of all well-pleaded facts in the complaint, as well as all reasonable inferences that may be drawn therefrom, in a light most favorable to the non-moving party. *Reiner*, 212 Md. App. at 151. "Dismissal of the action is only warranted if the allegations and permissible inferences, if true, would not afford relief to the plaintiff." *Williams*, 213 Md. App. at 651 (citation and internal quotation marks omitted). *Accord Reiner*, 212 Md. App. at 151.

### C. Analysis

In relevant part, CJP section 5-609 provides that:

A cause of action or disciplinary action may not arise against any mental health care provider or administrator for failing to predict, warn of, or take precautions to provide protection from a patient's violent behavior unless the mental health care provider or administrator knew of the patient's propensity for violence and the patient indicated to the mental health care provider or administrator, by speech, conduct, or writing, of the patient's intention to inflict imminent physical injury upon a specified victim or group of victims.

CJP § 5-609(b). This Court has interpreted this statute to mean that a mental health provider can be held liable for the violent behavior of their patients if they 1) had actual knowledge of the patient's propensity for violence, and 2) the patient indicated to the mental health professional in some manner that they intended to harm a specific victim. *Falk v. Southern Maryland Hosp., Inc.*, 129 Md. App. 402, 406 (1999). As the parties have noted, *Falk* is the only reported opinion wherein an appellate court has applied CJP section 5-609. We turn there next.

In *Falk*, the plaintiff, as personal representative of his mother's estate, filed suit against a hospital and some of its physicians after the conduct of a psychiatric patient under their care led to his mother's death. 129 Md. App. at 404. The patient—who was documented to have had behavior requiring restraints while at the hospital—struck a nurse, causing her to then fall into and knock over the plaintiff's mother. *See id.* at 404, 408. The plaintiff's mother suffered a broken hip as a result of the fall and later died of surgery-related complications. *See id.* at 404. The circuit court granted summary judgment in favor of the defendants, finding that CJP section 5-609 precluded them from liability, and we affirmed on the same premise. *Id.* at 405, 409. In arriving at that decision, we analyzed the text of CJP section 5-609, as well as the holdings in *Shaw v. Glickman*, 45 Md. App. 718 (1980), *Furr v. Spring Grove State Hospital*, 53 Md. App. 474 (1983), and *Hartford Insurance Company v. Manor Inn of Bethesda, Inc.*, 335 Md. 135 (1994), which all preceded the statute but were "entirely consistent" with its text. *Id.* at 406. We turn to a brief discussion of those cases.

In *Shaw*, a husband shot and injured his wife's paramour after discovering them in bed together. *Shaw*, 45 Md. App. at 719. The husband, although he had been informed of the identity of the paramour prior to the shooting, had never expressed an intent to kill or injure the paramour in counseling sessions with mental health professionals. *Id.* at 719, 725. Accordingly, we held that the paramour could not maintain an action against the mental health professionals for failure to warn. *See id.* at 725–26.

In *Furr*, a patient voluntarily committed himself to a state hospital for treatment of pedophilic urges. 53 Md. App. at 477–78. The patient later voluntarily left the hospital and

9

subsequently raped and killed a young boy. *Id.* at 480. Our court determined that the treating psychiatric team could not be held liable because the boy was an unforeseeable plaintiff, thereby negating any duty owed to him and precluding the suit. *See id.* at 488–89.

In *Manor Inn*, a patient—who was involuntarily committed to a state mental health hospital—escaped from the facility. 335 Md. at 139. The patient later stole a negligently unattended van that belonged to an inn and crashed it into an insured driver several days later,[16] causing damages. *Id.* at 139–40. The Supreme Court of Maryland concluded that the insurance company could not recover because—while the State breached its duty to supervise the patient, and the inn breached its duty to manage its van—the instance of an escaped patient stealing a van and subsequently causing an accident days later was unforeseeable.[17] *See id.* at 151, 153–54, 160–61.

After discussing *Shaw*, *Furr*, and *Manor Inn*, the *Falk* court likened the circumstances in the case to those of the plaintiff in *Palsgraf v. Long Island Railroad Company*, 162 N.E. 99 (N.Y. 1928). *See Falk*, 129 Md. App. at 407–08. In that case, employees of a railroad company dropped a package of explosives, which exploded and caused a set of scales to fall and injure a woman. 162 N.E. at 99. The New York Court of Appeals held that the railroad company was not liable for the injuries caused to the woman because she was not a foreseeable plaintiff. *Id.* at 101. Combining the principles discussed

---

[16] An inn employee left the van unattended with the doors unlocked and the keys in the ignition. 335 Md. at 139.

[17] Nonetheless, the Court also noted that the nature of the patient's dangerousness would have been an "ingredient in determining whether, and, if so, the extent to which the State owed a duty to [the insured]." *Id.* at 151.

10

above, the *Falk* court determined that neither the hospital nor its agents could be held liable because the plaintiff's mother was not a readily identifiable victim within a foreseeable zone of danger whose identity was known in advance. *Falk*, 129 Md. App. at 408–09 (citing *Manor Inn*, 335 Md. at 154).

### D. Application

Decedent was a "readily identifiable" potential victim within the "zone of danger" such that Sinai had a duty to warn her of Caples' homicidal ideation prior to her death. *Falk*, 129 Md. App. at 408. The *Falk*, *Shaw*, *Furr*, and *Manor Inn* courts declined to hold the mental health providers involved in those cases liable, concluding that it was unforeseeable that the victims in those cases faced a threat from the patients the providers treated. *See Falk*, 129 Md. App. at 408–09; *Shaw*, 45 Md. App. at 725–26; *Furr*, 53 Md. App. at 488–89; *Manor Inn*, 335 Md. at 150–51, 160–61. However, the victim in *Falk* was not the direct recipient of the patient's criminal conduct. 129 Md. App. at 404 (indicating that the patient struck a nurse who fell over and knocked the victim down, leading to her injury). In a similar vein, none of the patients in the cases mentioned above—during interactions with their medical providers—indicated that they would commit the specific criminal conduct in which they later engaged. *See generally Falk*, 129 Md. App. 402; *Shaw*, 45 Md. App. 718; *Furr*, 53 Md. App. 474; *see also Manor Inn*, 335 Md. at 151. Moreover, while the patients in *Shaw*, *Furr*, and *Manor Inn* directly caused harm to their victims, they were either free to roam the general public or otherwise escaped, such that the pool of potential victims was vast. *See Shaw*, 45 Md. App. at 719 (husband and wife were receiving outpatient counseling); *Furr*, 53 Md. App. at 477–78, 489 (patient was free to leave the

11

hospital because his admission was voluntary); *Manor Inn*, 335 Md. at 139 (patient escaped from the mental health facility). The instant case is distinguishable.

Here, unlike in *Falk*, Decedent was directly within the "zone of danger" and not the victim of an unforeseeable chain of events. *See* 129 Md. App. at 408–09. That is, the mother in *Falk* was not directly in harm's way (i.e., having direct contact with the patient under the hospital's care); she was an unintended victim who died as a result of surgical complications after being knocked over by a nurse whom the patient hit. *Id.* at 404. In other words, the mother was one step removed from the "zone of danger" and thus an unforeseeable victim. *Id.* at 408–09.

In this case, Decedent was one step closer. Caples twice expressed to Sinai Staff that he had homicidal ideation towards anyone in close proximity and twice failed to indicate on an assessment sheet that he was *not* having homicidal ideation. In addition, Caples' discharge summary noted that he had to be medicated for "recent episodes of aggression." Nonetheless, four hours after his second iteration of homicidal ideation, Sinai discharged Caples "with his wife to return home[,]" and he later killed her. We would be "hard-pressed to say, as a matter of law," that Decedent was not in the "zone of danger" under those circumstances. *See id.* at 408.

Caples' conduct was foreseeable. None of the patients in *Shaw*, *Furr*, or *Manor Inn* indicated—during interactions with their mental health providers—that they would have engaged in the violent conduct in which they ultimately did. *See generally Falk*, 129 Md. App. 402; *Shaw*, 45 Md. App. 718; *Furr*, 53 Md. App. 474; *see also Manor Inn*, 335 Md. at 151. For example, in *Manor Inn*, the Supreme Court of Maryland stated:

12

> It does not appear, however, that [the patient's] dangerousness involved [escaping] from State mental institutions and stealing automobiles, which he then crashed into other automobiles. Moreover, it could not be foreseen that [the patient], having [escaped], would go to Bethesda, steal a van, and drive it negligently, thus causing an accident.

335 Md. at 151. Here, Caples twice vocalized that he had homicidal ideation while an inpatient at Sinai, including on the morning of discharge. Moreover, Caples twice failed to indicate that he was *not* having suicidal and homicidal thoughts on the assessment sheets provided to him by Sinai, and he also had episodes of aggression for which he had to be medicated. Accordingly, Sinai had an indication that Caples' "dangerousness" included the potential to kill, making the later murder of Decedent a foreseeable event. *See Manor Inn*, 335 Md. at 151 (indicating that a patient's dangerousness is "an important ingredient in determining whether, and, if so, the extent to which, the [mental health provider] owed a duty to [the victim]").

Decedent was in a "readily identifiable" group of potential victims whose identities were known in advance. *Falk*, 129 Md. App. at 408. In *Shaw*, *Furr*, and *Manor Inn*, the patients were either free to roam the general public or otherwise escaped, such that their providers had no idea whom to warn because the pool of potential victims was vast. *See Shaw*, 45 Md. App. at 719; *Furr*, 53 Md. App. at 477–78, 489; *Manor Inn*, 335 Md. at 139. Stated differently, even if the patients had stated an intent to violently harm someone, the providers in those cases could not ascertain which particular individuals would be in danger. The same is not true in the case before us.

Here, Sinai discharged Caples into the care of his wife to return home after he twice vocalized that he wanted to kill anyone who came close to him and twice failed to check

13

assessment boxes to confirm that he was *not* having homicidal thoughts. Thus, unlike the providers in *Shaw*, *Furr*, and *Manor Inn*, Sinai knew where Caples was headed and, therefore, who was a potential victim. *See* 45 Md. App. at 719; 53 Md. App. at 477–78, 489; 335 Md. at 139. While it is true that "anyone who comes close" could be a broad category—and thus, Sinai might not have been able to ascertain *everyone* who fell within the category—two people would obviously fit into the category of people who would come close to Caples: Decedent and an adult son. Sinai had specific knowledge that both individuals resided with Caples at the time of his hospitalization and would continue to do so upon his release. Thus, Decedent and the adult son were "readily identifiable" potential targets such that Sinai had a duty to warn them of Caples' homicidal ideation expressed as recently as the morning of discharge because their identities were known in advance of the harm inflicted. *See Falk*, 129 Md. App. at 407–08 (relying on *Palsgraf* and *Manor Inn* for the proposition that psychiatrists' duty under CJP section 5-609 extends to "readily identifiable victims . . . within a foreseeable zone of danger whose identities are known in advance") (further citation omitted).

We recognize that the underlying facts in *Furr* have similarities to those here, in that both patients were free to leave the hospital, and both patients subsequently committed murder. *See Furr*, 53 Md. App. 479–80. However, the cases are distinguishable. In *Furr*, while providers could have assumed that the patient would engage in pedophilic activities upon leaving because he voluntarily sought help for such urges, the patient did not voice an intention to do so, nor an intention to commit murder. *Id.* Moreover, the patient in *Furr* was not discharged by the hospital to a particular person or persons; he left into the general

14

public. *Id.* at 479–80. Here, Sinai discharged Caples directly to his wife, who is named in the records, to return home, where he lived with her and an adult son. This release occurred after he twice vocalized a desire to kill anyone within close proximity and twice failed to indicate that he lacked homicidal ideation. Likewise, the release to his wife occurred without providing her any information or warning regarding his homicidal ideation. Sinai clearly had knowledge as to where Caples was headed and, minimally, at least two people with whom he would interact. Accordingly, while the child in *Furr* was an unforeseeable victim, the same is not true for Decedent.

Sinai invites us to read CJP section 5-609 much more narrowly, such that providers would have no duty to persons unless the patient specifically identifies them. Citing *Falk*, 129 Md. App. at 408, Sinai posits that foreseeability is not a factor to be considered when applying CJP section 5-609's directive that the patient identify a specific person or group as potential victims. We read *Falk* differently. *Falk* indeed states that "we need no longer speculate as to foreseeability because the statute specifically outlines the duty a psychiatrist owes a plaintiff." *Id.* at 408. However, preceding that clause are the words "[i]n situations such as this one[.]" *Id.* We interpret that to mean the underlying circumstances present in *Falk*, which are distinguishable from the case *sub judice* for the reasons stated above. Accordingly, we decline to interpret the statute and *Falk* as narrowly as Sinai suggests.

In addition to the statutory limitations, we conclude that CJP section 5-609 immunity does not extend to mental health providers where 1) the provider could have readily identified the victim from interactions with the patient prior to the harm inflicted, and 2) the potential victim was in a foreseeable zone of danger. Moreover, as to the

15

underlying facts here, where a patient expresses an intent to kill or harm anyone in their proximity, we hold that the provider, at a minimum, must warn those to whom the patient is being discharged, as they are undoubtedly ascertainable potential victims within a zone of danger.[18] In so holding, we emphasize that our discussion of foreseeability is limited to a fact-dependent inquiry of whether, under the circumstances, the words or conduct of a patient under the care of a mental health provider readily identify a "specified victim or group of victims," such that the provider has a duty to warn them of potential danger pursuant to CJP section 5-609. *See* CJP § 5-609(b). This interpretation is "entirely consistent" with *Falk* and the wording of CJP section 5-609. *See Falk*, 129 Md. App. at 406, 408.

*Imminent Threat*

We next turn to Sinai's assertion that we should affirm the circuit court's ruling because Caples' expressions of homicidal ideation did not communicate an imminent threat. Sinai argues that 1) Caples did nothing "in furtherance of the 'threat[s]'" made while at Sinai; 2) Caples expressly denied having homicidal ideation three times before he was discharged; and 3) Caples denied having homicidal ideation at his outpatient appointment on November 30, 2020, a week following his discharge. Decedent's Survivors contend that Decedent faced an imminent threat, given that Sinai discharged Caples into her care the same day he expressed wanting to kill anyone who came close to him. Neither CJP section

---

[18] As discussed above, liability under these circumstances might differ if the patient was released or escaped into the general public. In such instances, the pool of potential victims could be vast such that the mental health providers would not know whom to warn.

16

5-609 nor *Falk* define the term "imminent." Accordingly, "we may refer to the dictionary and give the words their ordinary meaning." *Turenne v. State*, 488 Md. 239, 285 (2024) (citation omitted). Merriam-Webster Dictionary defines imminent as "ready to take place: happening soon[.]"[19] In addition, the Supreme Court of Maryland, as it pertains to imperfect self-defense, has indicated that "an imminent threat is not dependent on its temporal proximity to the defensive act. *Rather, it is one that places the [potential victim] in imminent fear for [their] life*." *Porter v. State*, 455 Md. 220, 245 (2017) (emphasis added).[20] While we acknowledge that temporality has an implication on imminency, whether a potential victim faced an imminent threat is generally a question for the jury to decide, considering the totality of the circumstances that existed at the time the threat was made. *See id.* at 253 (indicating that "it is up to the jury to decide" whether an individual faced imminent harm once there is "some evidence" to that effect). In other words, at the motion to dismiss stage, consideration should be given to whether there is an allegation

---

[19] *Imminent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/imminent, archived at https://perma.cc/9GZH-DD88 (last visited Mar. 26, 2026).

[20] We note that in *Porter*, the Supreme Court of Maryland was tasked with interpreting and thus giving independent meaning to two words, "imminent" and "immediate," as they relate to a disjunctive statutory requirement regarding imperfect self-defense—a criminal matter. *See Porter v. State*, 455 Md. at 245 (citation omitted) (noting that a defendant must show that they "actually feared imminent or immediate danger—not both" to generate an imperfect self-defense instruction). Here, CJP section 5-609(b) requires that we interpret the term "imminent" for the purposes of civil liability.

that—prospectively from the time the threat was made to the time the harm was ultimately inflicted—the harm inflicted was "ready to take place" or "happening soon."[21, 22]

Here, Decedent's Survivors pled in their complaint that Caples twice vocalized that he wanted to kill anyone who came close to him, including on November 24, 2020, the day he was discharged. Moreover, the Janofsky Attachment to the complaint notes that Caples twice failed to indicate that he was *not* homicidal on paper assessments provided by members of Sinai staff, and had to be medicated due to episodes of aggression. Additionally, an inference available from the complaint is that Caples knew he was being discharged to his wife that day, because he had retracted his seventy-two-hour notice, which was close to expiration. That Caples did not act in furtherance of the threat before discharge, subsequently denied having homicidal ideation while at Sinai, and denied having homicidal ideation at an appointment *after* Sinai discharged him, does not establish, as a matter of law, that Sinai was not obligated to inform the decedent of Caples' threats. *See Porter*, 455 Md. at 245 ("[A]n imminent threat is not dependent on its temporal proximity[.]").

Viewing the allegations in the complaint and its attachments, "as well as all inferences that may reasonably be drawn from them" in the light most favorable to Decedent's Survivors, we conclude that a jury *could* reasonably find that Caples' conduct

---

[21] *See Imminent*, Merriam-Webster, *supra* n.19.

[22] Relevant factors may include the nature of the threat communicated, as well as whether there was any escalation in the threats made toward the potential victim. *Cf. Porter*, 455 Md. at 252–53.

demonstrated an "intention to inflict imminent physical injury" upon Decedent. *See* CJP §

5-609(b). *See also Reiner*, 212 Md. App. at 151 (citations omitted).

*Propensity for Violence*

Last, we turn to Sinai's assertion that we should affirm the judgment of the circuit

court because Caples did not show a propensity for violence. Decedent's Survivors posit

that the homicidal statements themselves show that Caples had a propensity for violence.

Neither CJP section 5-609 nor *Falk* define "propensity," so we turn again to the dictionary

for its plain meaning. *Turenne*, 488 Md. at 285. As defined, propensity is "an often intense

natural inclination or preference[.]"[23] *Accord* MPJI-Cr 3:23 (indicating that propensity

evidence is used to show that someone "has a tendency to commit a crime").

As discussed at length above, Caples had a history of suicidal ideation and expressed

such thoughts, as well as homicidal ideation, multiple times on multiple days while under

Sinai's care. In addition, per the Janofsky Attachment, Caples had to be medicated due to

episodes of aggression. Viewing the allegations in the complaint and its attachments, "as

well as all inferences that may reasonably be drawn from them" in the light most favorable

to Decedent's Survivors, we conclude that a jury *could* reasonably find that Caples'

conduct demonstrated a "propensity for violence." *See* CJP § 5-609(b). *See also Reiner*,

212 Md. App. at 151.[24] Accordingly, we find that the trial court erred in dismissing the suit.

---

[23] *Propensity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/propensity, archived at https://perma.cc/4XT7-WJ3H (last visited Mar. 26, 2026).

[24] We arrive at this conclusion, finding no precedent or statute that requires there to be an overt act in order to show a propensity for violence, or that propensity for violence may be shown by words alone.

19

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**